

Opinions of the United
States Court of Appeals
for the Third Circuit

8-21-1997

# Dunleavy v. Delaware

Precedential or Non-Precedential:

Docket 96-1617

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"Dunleavy v. Delaware" (1997). *1997 Decisions.* Paper 201.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/201

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled August 21, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1617

UNITED STATES OF AMERICA, EX. REL.
ANTHONY J. DUNLEAVY

v.

COUNTY OF DELAWARE, EDWIN B. ERICKSON, III
EXECUTIVE DIRECTOR; COUNCIL OF THE COUNTY OF
DELAWARE, WARD T. WILLIAMS, ESQ., CHAIRMAN;
MARYANN ARTY; EDWIN B. ERICKSON; MATTHEW J.
HAYES; WARD WILLIAMS, ESQUIRE

Anthony J. Dunleavy,

Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 94-cv-07000)

Argued January 30, 1997

Before: BECKER and ROTH, <u>Circuit Judges</u>
and BARRY,1 <u>District Judge</u>

(Opinion Filed August 21, 1997)

_____

1. Honorable Maryanne Trump Barry, United States District Court Judge
for the District of New Jersey, sitting by designation.

Regina D. Poserina, Esq. (Argued)
7415 West Chester Pike
Upper Darby, PA 19082

 Attorney for Appellant

Francis X. Crowley, Esq. (Argued)
Paul D. McNichol, Esq.
Blank, Rome, Comisky & McCauley
1400 North Providence Road,
 Suite 301
Media, PA 19063

 Attorneys for Appellees

Priscilla R. Budeiri, Esq.
Lisa R. Hovelson, Esq.
Alan Shusterman, Esq.
Gary W. Thompson, Esq.
Taxpayers Against Fraud
The False Claims Act Legal Center
Suite 501
1220 Nineteenth Street, N.W.
Washington, D.C. 20036

 Attorneys for Amicus-Appellant

**OPINION OF THE COURT**

ROTH, Circuit Judge:

With this appeal, we examine another chapter in the history of Route 476, known to those in the Philadelphia area, who for so many years awaited its opening, as the "Blue Route." In this qui tam action, Anthony J. Dunleavy (the "Relator") sues Delaware County on behalf of the United States to recover treble damages in the amount of $1,450,000, the return of over $16 million in Department of Housing and Urban Development funds made available to the County from 1992 to 1995, and various other costs, interest, and penalties associated with the County's alleged violations of the False Claims Act (the "FCA" or "Act"), 31 U.S.C. §§ 3729-3733.

The district court dismissed Dunleavy's Second Amended Complaint on the ground that it lacked subject matter jurisdiction because the action was based solely on information or allegations that had been publicly disclosed through various newspaper articles, a pre-trial memorandum prepared by Delaware County in previous unrelated litigation, several annual audits prepared by Delaware County and submitted to the federal government, and a 1992 Grantee Performance Report ("GPR") prepared by Delaware County and submitted to HUD. This appeal raises issues which require us to further define the circumstances under which a qui tam action will be deemed to be "based upon the public disclosures of allegations or transactions." We find that the district court relied upon assumptions which broadened the FCA's Public Disclosure Bar beyond its intended scope. Hence, we will reverse and remand this case for further proceedings.

## I. Facts and Procedural History

The following facts are taken from Dunleavy's Second Amended Complaint. For purposes of this motion to dismiss, they, in the main, may be taken as true.[2]

The events challenged here occurred in 1976 while Dunleavy was working as a consultant to Delaware County. Dunleavy's role was to advise the County with respect to HUD's Community Planning and Development programs, HUD's Community Development Block Grant program ("CDBG"), and other related federal government programs.

_____

2. We realize that where jurisdiction is at issue, the norm is not to accord the party whose burden it is to plead jurisdiction the presumption of truth as to facts pleaded that must be resolved in answering that question. See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (Supp. 1996). We are also cognizant that in certain situations in which our jurisdiction is at issue we may be entitled to look beyond the pleadings to satisfy ourselves as to the existence or non-existence of jurisdiction. See, e.g., Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). Neither of these principles influences the outcome of this case because our review can be accomplished without relying on these disputed facts and without consideration of contested matters not appearing in the pleadings.

In 1976, the County acquired by way of condemnation a 56.6 acre tract of land adjacent to the Smedley County Park in Nether Providence Township. The tract is known locally as the Penza Tract. To make this acquisition, the County appropriated approximately $1,839,500 in funds provided by HUD and $685,000 in its own funds.

Despite the County's original plans to expand the park, on January 26, 1979, it sold a 26.3 acre portion of the Penza Tract to the Pennsylvania Department of Transportation ("PennDOT") for $1,988,550. PennDOT acquired the land for the planned construction of Route I-476. A short time later, in 1981, the County conveyed an additional 1.9 acre section of the Penza Tract to PennDOT for $103,950. Both sales were, however, contingent on pending environmental litigation being resolved in a way that would permit the Blue Route to be constructed through the region. For this reason, the County agreed to place the proceeds of the two Penza Tract sales in an escrow investment account.

The completion of the Blue Route remained blocked by litigation for the next several years. In 1988, however, the County transferred yet another parcel of the Penza Tract to PennDOT at a cost of $1,000,000.[3] The last litigation barrier to the construction of the Blue Route was resolved in 1991, when the remaining actions were settled. Construction began again and the Blue Route was opened a short time later.

Dunleavy left the service of Delaware County in 1992 when his consulting firm's contract was terminated. On November 18, 1994, Dunleavy initiated this qui tam action against Delaware County, the County Council, and certain current and former members of the Council and officers in the County. On March 7, 1995, Dunleavy filed a First Amended Complaint. Then on August 14, he filed a Second Amended Complaint without seeking leave of the Court or the other parties' consent. On September 15, Dunleavy

_____

3. The County disputes the accuracy of this allegation, contending that this sale actually involved a different tract of land not subject to HUD oversight. This is a factual question for resolution on the merits. We need not address it here.

4

belatedly filed a Petition for Leave to Amend which, despite the procedural irregularity, was granted by the district court on November 8, 1995.

This action remained under seal, as required by 31 U.S.C. § 3730(b)(2), until September 5, 1995. During that period the U.S. Attorney and HUD investigated the viability of Dunleavy's complaint.4 On August 10, 1995, at the conclusion of the investigation, the U.S. Attorney issued a Notice of Declination of Appearance, pursuant to 31 U.S.C. § 3730(b)(4)(B), concluding that the matters raised in Dunleavy's complaint did not constitute fraud within the meaning of the False Claims Act. At the same time, the U.S. Attorney turned over control of the investigation to HUD to review the matter for compliance with CDBG guidelines.

HUD pursued its own investigation of the Penza Tract fund in March and April of 1996 and issued a Limited Audit Review on April 29, 1996. As a result of the Audit, HUD made a demand on the County for the return of nearly $2 million in HUD funds. At some point the County and HUD began negotiations to determine the amount of the funds owing to HUD. After learning of the possibility of settlement, Dunleavy claimed rights to notice and a hearing under § 3730(c)(2)(B) of the FCA. He alsofiled numerous Freedom of Information Act requests on HUD and on the U.S. Attorney.

Despite Dunleavy's protests against a settlement, HUD denied him the opportunity to intercede and participate in the negotiations. On September 11, 1996, HUD agreed to accept the County's settlement offer of $1,921,699. Under the terms of the settlement, the County was to remit a check to HUD, and HUD would then return the funds to the County's line-of-credit where the monies would be available for eligible and fundable activities. Dunleavy unsuccessfully petitioned the district court to stay the administrative action necessary for settlement.5 Dunleavy then unsuccessfully sought a stay from this Court.

---

4. An unknown party did leak information about the suit to the press in the interim.
5. As of the date of the consummation of the settlement and of Dunleavy's application to the district court for a stay, Dunleavy's qui tam action had already been dismissed by the district court for want of jurisdiction.

Dunleavy's Second Amended Complaint alleges three counts of violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2), & (a)(7), one count of common law fraud, one count of payment under mistake of fact, and one count of breach of contract. Dunleavy's theory is that Delaware County defrauded HUD by not reporting and returning proceeds from the sale of the Penza Tract.

Specifically, Dunleavy contends that the HUD funds used to acquire the Penza Tract were subject to a contractual agreement between the County and the federal government. This agreement required the County to follow HUD rules and regulations which limit the permissible uses of the funds and impose certain reporting requirements on the County. Dunleavy reasons that, since the Penza Tract was originally acquired with HUD funds, the County was required to treat the monies as "program income" and to provide accounts of the transactions to HUD. Dunleavy further contends that, once it became apparent in 1991 that the County would not reacquire the Penza Tract, the defendants should have known, or knew but recklessly disregarded, their obligation to report the receipt of the Penza Tract monies in Annual Audits and Grantee Performance Reports and to repay those moneys to HUD.

On July 12, 1996, the district court dismissed Dunleavy's Second Amended Complaint, finding that it lacked subject matter jurisdiction. United States ex rel. Dunleavy v. County of Delaware, No. 94-7000, 1996 WL 392545 (E.D. Pa. July 12, 1996). The district court held that Dunleavy's action violated the jurisdictional bar of 31 U.S.C. § 3730(e)(4)(A), which divests the federal courts of jurisdiction over qui tam suits "based upon publicly disclosed allegations or transactions." The trial court found that certain newspaper articles, a pre-trial memorandum from unrelated litigation, and the County's annual audits and GPRs publicly disclosed, prior to the filing of Dunleavy's complaint, both the misrepresented and the actual facts necessary to complete the inference of fraud. The district court assumed that all these documents were acceptable sources of public disclosure under the Act. The court then concluded that Dunleavy had not qualified as an original source under the Act.

6

Dunleavy filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the district court's dismissal of the complaint for lack of subject matter jurisdiction is plenary. United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1152 (3d Cir. 1991).

## II. Discussion

The False Claims Act has been with us in one form or another since the Civil War. Act of March 2, 1863, ch. 67, § 4, 12 Stat. 698 (1863). The FCA sets out civil and criminal penalties for persons who knowingly submit false claims to the government.

The novel aspect of the FCA is the mechanism Congress has chosen for its enforcement. A private person with knowledge of fraud against the government, acting as a de facto "attorney general," can instigate litigation on the government's behalf against the parties responsible. Such suits are known as qui tam actions.[6]

The FCA contains a built in incentive for a private plaintiff, known as the "relator," to bring suit. Under the original statute, a prevailing relator could come away with up to one-half of the damages and forfeitures recovered and collected.[7] S. Rep. No. 345, 99th Cong., 2d Sess., at 10, reprinted in 1986 U.S.C.C.A.N. 5266, 5275. Congress has shrewdly "offset inadequate law enforcement resources and encouraged `a rogue to catch a rogue' by inducing informers `to betray [their] conspirators.' " United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 679 (D.C. Cir.

---

6. qui tam action takes its name from the Latin phrase "qui tam pro domino rege quam pro si ipso in hac parte sequitur" meaning "who sues on behalf of the King as well as for himself." Black's Law Dictionary 1251 (6th ed. 1990). Qui tam actions have their origins in the Thirteenth century royal courts of England where they were employed as a form of legal fiction. Lightly regarded local courts had jurisdiction over private wrongs. But a recitation that the suit was in the King's interest could provide access to the royal courts. See John T. Boese, Civil False Claims and Qui Tam Actions 1-7 (1995).

7. The most recent incarnation of the Act has reduced this percentage but it still remains substantial. See 31 U.S.C. § 3730(d).

7

1997) (quoting Cong. Globe, 37th Cong., 3d Sess. 955–56 (1863)).

The Act requires a qui tam plaintiff, before proceeding with suit, to disclose to the government the information on which the claim is based. 31 U.S.C. § 3730(b). The government then has sixty days to investigate the matter and to decide whether to intervene. The government also has the option to step into the action at a later date. 31 U.S.C. § 3730(c)(3). In either case, the relator is not entitled to a recovery under the Act if the action is one which runs afoul of the jurisdictional bars contained in 31 U.S.C. § 3730(e).

For example, the public disclosure bar operates under this section to divest the plaintiffs of subject matter jurisdiction if: (1) there was a public disclosure; (2) of "allegations or transactions" of the fraud; (3) "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."; (4) that the relator's action was "based upon." If the relator fails the public disclosure bar, he or she can only establish subject matter jurisdiction if he or she is an "original source" of the information. 31 U.S.C. § 3730(e)(4).

## A. Effect of HUD Settlement

At oral argument, we questioned the parties about the viability of this suit after HUD's settlement with the County. Both the parties and this Court agree that, notwithstanding the settlement, Delaware County continues to have an interest in the outcome of this qui tam action because damages may be awarded which exceed the amount paid by Delaware County to HUD in settlement.

There is no question that under certain circumstances it is appropriate for the federal government to proceed administratively against a FCA defendant. The Act expressly contemplates such a move:

Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any

8

administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

31 U.S.C. § 3730(c)(5). What is not clear on the record before us is whether the U.S. Attorney and HUD intended the settlement with the County to extinguish the government's claims under the FCA or whether the settlement addressed a less serious transgression such as a misinterpretation by the County of its obligations under the CDBG program.8

However, we need not decide whether the settlement terminated the government's rights against Delaware County under the Act, because Dunleavy's right to proceed with his qui tam action remains unimpaired. Subsection (c)(5) preserves a relator's right to a percentage of the recovery even when the government chooses to pursue its claim administratively. See United States ex rel. Green v. Northrop Corp., 59 F.3d 953, 963–64 (9th Cir. 1995), cert. denied, 116 S. Ct. 2550 (1996); United States ex rel. DeCarlo v. Kiewit/AFC Enterprises, Inc., 937 F. Supp. 1039, 1045 (S.D.N.Y. 1996). Because the government never exercised its rights to intervene, the settlement between HUD and Delaware County does not negate Dunleavy's ability, as the relator, to proceed independently with his qui tam action.

We agree with the Eleventh Circuit's conclusion that the False Claims Act's purpose is not limited to punishing the wrongs against the general public; the FCA alsofills a remedial capacity in redressing injury to the individual

_____

8. In its Notice of Declination to Appear, the government stated its belief, formed after its investigation of the allegations contained in Dunleavy's complaint, that the County's actions did not amount to fraud within the meaning of the FCA. Additionally, it is not clear whether the investigation undertaken by the government even amounted to the type of alternate proceeding contemplated in § 3730(c)(5). HUD did no more than conduct an audit and make a demand upon Delaware County for payment, at which point the parties reached a settlement.

9

relator. See United States ex rel. Neher v. NEC Corp., 11 F.3d 136, 137 (11th Cir. 1994). In Neher, the court described the reasons for treating a qui tam action as one addressed to the relator's injuries:

First, a qui tam relator can suffer severe emotional strain due to the discovery of his unwilling involvement in fraudulent activity. Moreover, the actual or potential ramifications on a relator's employment can be substantial. As several courts have recognized, qui tam relators face the Hobson's choice of "keeping silent about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercussions, some as extreme as dismissal." Finally, the relator can suffer substantial financial burdens as a result of the time and expense involved in bringing a qui tam action.

Id. at 138 (quoting United States ex rel. Robinson v. Northrop Corp., 824 F. Supp. 830, 835 (N.D. Ill. 1993).

The legislative history of the 1986 Amendments to the Act is also instructive. The report accompanying the Senate version of the amendments, which Congress passed in lieu of those in the House bill, explains the Government's right to proceed administratively as an alternate remedy to an FCA action. See S. Rep. 99-345, 99th Cong., 2d Sess. 27, reprinted in 1986 U.S.C.C.A.N. 5266, 5292. While the Government can compel dismissal or settlement of a qui tam action if it formally intervenes, 31 U.S.C.§ 3730(c), Congress believed that "if the Government declines to intervene in a qui tam action, it is estopped from pursuing the same action administratively or in a separate judicial action." Id., reprinted in 1986 U.S.C.C.A.N. at 5292.

Since Dunleavy, if a proper relator, has an interest in pursuing his claim independently of the government, the government, which has elected not to intervene, cannot compromise Dunleavy's claim even if the government has settled its own claim. A viable case or controversy therefore continues to exist since Delaware County's potential exposure in Dunleavy's qui tam action may ultimately exceed that which it accepted in its settlement with HUD.

10

## B. The Public Disclosure Bar

The present language of the Public Disclosure Bar comes from Congress's extensive amendment of the False Claims Act in 1986. As recounted more fully in our opinion in United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. The Prudential Ins. Co., 944 F.2d 1149, 1152-54 (3d Cir. 1991), the 1986 amendments were an attempt to correct what Congress perceived as a century old imbalance between the under-deterrence of the original Act, which permitted "parasitic" qui tam actions to be brought by individuals with no independent knowledge of fraud, and the over-deterrence of the 1943 amendments which denied jurisdiction over all qui tam actions "based on evidence or information the government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded). Given that the 1943 Act almost entirely prevented the successful prosecution of qui tam suits, it is apparent from the legislative history of the 1986 amendments that Congress was mindful of the need "to encourage persons with first-hand knowledge of fraudulent misconduct to report fraud." Stinson, 944 F.2d at 1154. Moreover, Congress sought to enhance the government's ability to detect fraud by gaining "the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity." S. Rep. No. 345, 99th Cong. 2d Sess. 4, reprinted in 1986 U.S.C.C.A.N. 5269.

The current version of the Public Disclosure Bar has generated a host of interpretive issues, some of which are implicated in this appeal. Among the questions generated are the following:

(1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this "public disclosure"; and, if so, (4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B)."

United States ex rel. Fine v. MK-Ferguson Co. , 99 F.3d 1538, 1544 (10th Cir. 1996). We are concerned with only the first

two of these four questions. Because we conclude that jurisdiction is present based on our finding that "allegations or transactions" of fraud were never contained in sources qualifying as "public disclosures" under the FCA, we need not proceed further.

1. Are the Disclosures of "Allegations or Transactions"?

We must first determine whether the County has identified any sources which publicly disclosed the alleged fraud or the underlying fraudulent transaction. The County points to four sources for the jurisdictional bar: (i) several newspaper articles discussing the acquisition of the Penza tract; (ii) a pre-trial memorandum filed with the court in prior unrelated litigation initiated by a community interest group to challenge the County's use of HUD funds; (iii) annual financial audits submitted to the federal government pursuant to the County's obligation under the Single Audit Act, 31 U.S.C. § 7502; and (iv) a 1992 Grantee Performance Report prepared by the County and submitted to HUD as required by § 104(e) of the Housing and Community Development Act of 1974, 52 U.S.C. § 5304(e). For the reasons that follow, we conclude that only the County's GPR, if considered a public disclosure, reveals information crucial to making an inference of fraud.

In this regard, the crucial question arises from the statutory language, "based upon the public disclosure of allegations or transactions." 31 U.S.C. § 3730(e)(4)(A). We must consider whether the information disclosed constitutes "allegations or transactions." As another court has explained, "the Act bars suits based on publicly disclosed `allegations or transactions,' not information." Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992).

It is clear that the FCA's reference to "allegations or transactions" is in the disjunctive, so that disclosures which reveal either the allegations of fraud or the elements of the underlying fraudulent transaction are sufficient to invoke the jurisdictional bar. Findley, 105 F.3d at 686–87; United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 n.2 (10th Cir. 1992); see also Hagood v. Sonoma Water County Agency, 81 F.3d 1465, 1473 (9th

12

Cir.), cert. denied, 117 S. Ct. 175 (1996) ("the jurisdictional bar may be raised by public disclosure unaccompanied by an explicit allegation of fraud").

The District of Columbia Circuit has devised a useful formula for determining the quantum of information that must be disclosed before the jurisdictional bar comes into play:

[I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994). The Springfield Terminal court goes on to explain that the inference of fraud requires recognition of but two elements: "a misrepresented state of facts and a true state of facts." Id. at 655. Injected into the above formula the variables take on the following labels: "X (misrepresented state of facts) + Y (true state of facts) = Z (fraud)." Findley, 105 F.3d at 687.

It is not seriously contended that the Z variable has been disclosed here. The record is devoid of any public accusation of wrongdoing against the County before Dunleavy filed his qui tam action. HUD's audit of Delaware County's CDBG Program Penza Tract Fund did not begin until March 1996 and was itself a product of this suit. Therefore, unless we find disclosures in the record of both the X and Y variables, we have no reason for calling down the jurisdictional bar.

In everyday language, a "transaction" generally involves "an exchange between two parties or things that reciprocally affect or influence one another." Springfield Terminal, 14 F.3d at 654 (citing Webster's Third New International Dictionary 55 (1976)). What makes a particular transaction "fraudulent" within the meaning of the False Claims Act is less clear. We think it is sufficient, at least in considering the application of the disclosure bar, that the transaction merely be one in which a set of

misrepresented facts has been submitted to the government.9 This we believe is consistent with the broader definitions of fraud employed in the False Claims Act. See Wang, 975 F.2d at 1420 ("The Act's scienter requirement is something less than that set out in the common law").

In discussing the contents of his Second Amended Complaint, Dunleavy insists that

his allegation of fraud was not Delaware County's mere failure to return the proceeds to HUD. By contrast, Mr. Dunleavy alleged that Delaware County only had the obligation to return the proceeds <u>after</u> the Blue Route opened. Mr. Dunleavy's allegation of fraud, therefore, is that <u>after the Blue Route opened</u>, Delaware County had an obligation to report or return the proceeds to the government but failed to do so.

Appellant's Br. at 14. By this statement, we understand Dunleavy to contend that the crucial acts by the County necessary to the completion of this fraudulent transaction were its retention of the proceeds from the sale of the Penza Tract and its failure to inform HUD that it had these funds after the opening of the Blue Route ripened the obligation to return the money.

We view the fraudulent scheme pled in Dunleavy's Second Amended Complaint as having four essential elements for purposes of our jurisdictional inquiry under the FCA's public disclosure bar: (1) the County was the recipient of funds belonging to the federal government; (2) the County had an obligation to repay those funds to the federal government; (3) the County failed to repay those funds to the federal government after the obligation became owing; and (4) the County failed to disclose to the federal government that funds belonging to it were in the County's possession. Elements one through three account for the "actual state of facts," while the fourth element corresponds to the "misrepresented state of facts."

_____

9. This broad statement assumes, of course, the relator's good faith attempt to make allegations conforming to claims specified in 31 U.S.C. § 3729(a).

14

The County identifies three newspaper articles which appeared in February 1980 and discussed Delaware County's purchase and sale of the Penza tract as well as its relationship with HUD.10 One of the articles stated "the county paid $1.8 million in federal Community Development funds for the [Penza Tract] property in 1976. . . . In January [1980] the county sold 26 – acres less than half the tract – to PennDOT for the Blue Route for $1.9 million . . . ." App. at 90. Another article from the same year reported in greater detail on the possible uses for the sale proceeds:

[Delaware County's Council Chairman, Charlie] Keeler said the original $1.8 million the county spent with Community Development funds would have to be spent on projects permitted under that program's regulations. <u>Any additional property accrued in interest could be spent for other purposes, including improving the remaining park area.</u>

App. at 91 (emphasis added). A third article explained the transaction in which the Penza Tract was sold but contained no references to what would become of the sale's proceeds. App. at 92. The district court viewed all three articles as revealing essential facts about the purchase and sale of the Penza Tract as well as the use made by the County of CDBG funds and of the Penza Tract sale's proceeds.

The district court also relied on a Pretrial Memorandum prepared on the County's behalf in an unrelated citizens' suit against the County. Dunleavy refers to this memorandum in his Second Amended Complaint. Second Amended Compl. at ¶ 24. In the memorandum, County officials represented that proceeds from the sale of the Penza Tract to the Commonwealth would "be returned to the Community Development program in accordance with HUD regulations." App. at 33. The district court viewed the

_____

10. Although these newspaper articles are not mentioned in the pleadings, there is no reason why they may not be relied upon in determining whether we possess subject matter jurisdiction. Indeed, the newspaper articles were appended to the County's Rule 12(b)(1) Motion to Dismiss filed in the district court.

memorandum as a public disclosure of the County's knowledge of its obligation to return the funds to the federal fisc.

A third source of information derives from Annual Financial Audits submitted by the County to the federal government in accordance with its obligations under the Single Audit Act, 31 U.S.C. § 7501 et seq. These audits each contained a Balance Sheet and Statement of Revenues, Expenditures, and Changes in Fund Balance for several accounts including one called the Penza Fund. The Penza Fund was described in the audits as a fund

established to account for the proceeds and related investment income on the sale of a County owned tract of land to the Commonwealth of Pennsylvania, the County's intention is to use these funds for the purchase of land.

See, e.g., App. at 94. Despite the changes in the status of the accounts from 1985 to 1993, this description of the fund's purpose remained a constant. The district court found that these audits revealed the County's retention of the proceeds from the sale of the Penza Tract and the County's use of the interest from these proceeds.

The final source identified by the parties and relied on by the district court is a 1992 GPR submitted by the County to the federal government. In this report, the County failed to account for the proceeds of the sale of the Penza Tract held in its accounts. The district court found that, by omitting the Penza Tract fund from the GPR, the County completed the disclosure of all material elements of the fraudulent transaction since this act "disclosed the County's alleged failure to report the proceeds to HUD as program income." Dunleavy, 1996 WL 392545, at *3.

Dunleavy now contends that no combination of these documents could have revealed all the necessary elements to complete the inference of fraud. In particular, Dunleavy dismisses the GPR as "devoid of any information related to the Penza tract, the escrow fund, or the fraud scheme." Dunleavy insists that the GPR does not complete the disclosure of the fraudulent transaction because

16

[t]he 1992 GPR does not report any program income related to the sale of the Penza tract. It contains absolutely no information about the escrowed proceeds of the sale of a portion of the Penza tract, the obligation to return those proceeds or the use of those proceeds. It is absolutely silent as to any issue that is related the fraud scheme alleged by Mr. Dunleavy.

Appellant's Br. at 22.

The County concedes the accuracy of Dunleavy's reading of the GPR but argues the significance of this source derives from what the GPR does <u>not</u> say:

[T]he only allegation which arguably was not disclosed was the actual non-reporting of the proceeds (and the interest thereon) as Program Income under the CDBG program. However, as shown herein, the County <u>did</u> report the receipt of the proceeds and interest through other public disclosures (i.e. the articles and audits). . . . [T]he fact of non-reporting was in the possession of the Government -- that is, in addition to being the recipient of most (if not all) of the public disclosures, the Government also received the annual Grantee Performance Report ("GPR") which allegedly omitted the proceeds as Program Income. . . . HUD was in possession of the public disclosures outlined above <u>and</u> was in possession of the GPRs allegedly omitting the Program Income . . . .

Appellee's Br. at 27. The County maintains that it is the submission of the 1992 GPR to the federal government which completes the inference of fraud since it publicly exposed the inconsistencies in the County's other statements which acknowledged the County's retention and use of program income and interest, and the non-disclosure of that Program Income in the GPR itself.

We conclude that the 1992 GPR is the only source that, if publicly disclosed, would complete the inference of fraud.11
_____

11. Here there is no evidence that, prior to Dunleavy's filing of his Complaint, the federal government had done anything more than place this information, along with countless other reams of paper, in some government file room.

17

As already stated, no source makes a public allegation of fraud. The remaining sources disclosed only the actual state of facts, i.e. the County's retention of the Penza Tract proceeds and interest. It is undisputed that only the 1992 GPR contained the misrepresented state of facts, i.e., the County's failure to inform the federal government that it had these funds in its possession.12

Although neither Dunleavy nor the County has produced the 1992 GPR as part of the record, they are in apparent agreement that Delaware County was obliged, but failed, to disclose its possession of the Penza Tract proceeds in the 1992 GPR. Congress explicitly provided for the submission of such reports to be used in the Secretary's review of program implementation:

Each grantee shall submit to the Secretary . . . a performance report and evaluation report concerning the use of funds made available under section 5306 of this title, together with an assessment by the grantee of the relationship of such use to the objectives identified in the grantee's statement [of objectives previously provided to the Secretary]. . . . The grantee's report shall indicate its programmatic accomplishments, the nature and reason for changes in the grantee's program objectives, indications of how the grantee would change its program as a result of its experiences, and an evaluation of the extent to which its funds were used for activities that benefited low- and moderate-income persons. The report shall include a summary of any comments received by the grantee from citizens in its jurisdiction respecting its program.

42 U.S.C. § 5304(e) (1992) (emphasis added). Specifically, HUD regulations imposed a duty to record program income received or expended as part of the CDBG program. See 24 C.F.R. § 570.504(a) (1993).

_____

12. To Dunleavy's way of thinking, disclosures that antedated the opening of the Blue Route are immaterial to our consideration of the public disclosure bar. We do not agree. While the inference of fraud may not have been complete until the County's 1992 GPR disclosed the misrepresented state of facts, the elements of the fraud disclosed prior to that point are relevant to such a fraudulent scheme and do not become immaterial because of the simple passage of time.

18

Without the benefit of Dunleavy's insider position, someone investigating government fraud would be able to ascertain that the County had not fulfilled its reporting obligation only if that individual had access to the GPR.

## 2. Is the GPR a Public Disclosure?

Our only remaining task then is to determine whether the County's 1992 GPR constitutes a "public disclosure" within the meaning of § 3730(e)(4)(A). Neither party focussed on this issue;13 instead, both litigants concentrate on identifying the elements of the alleged fraudulent transactions, under the apparent assumption that the GPR effected a public disclosure under the "potentially available" standard developed by this Court in Stinson, 944 F.2d at 1157–60. Indeed, the district court shared this view of the GPRs in its simple conclusion that "[t]he omission of the Penza Fund from annual GPRs disclosed the County's alleged failure to report the proceeds to HUD as program income." Dunleavy, 1996 WL 392545, at *3. We believe, however, that this aspect of the case merits more attention than it has been given.

To answer the question whether a certain fact has been "publicly disclosed," we must make two distinct inquiries. The first is to ask whether the source is one recognized by the Act. The second posits whether the extent of disclosure is sufficient to support the conclusion that the information contained therein is now public within the meaning of the Act. Stinson supports this division of our exploration. 944 F.2d at 1154–60. In Stinson, we also undertook a two–part inquiry. We first examined whether the term "civil . . . hearing" as used in § 3730(e)(4)(A) encompassed documents produced by a litigant but not filed with the court as part of discovery proceedings during civil litigation. Id. at 1154–1157. Upon concluding that the statute did indeed contemplate this aspect of litigation as a source, we next determined to what extent the disclosure must be made

_____

13. Dunleavy does note in passing that "[t]he GPR's are not the types of disclosures enumerated by the statute, and must not be considered as public disclosures." Appellant's Br. at 16–17.

19

public before the jurisdictional bar is invoked. Id. at 1157–60.

Similarly, we will first consider whether a GPR represents a source of disclosure contemplated by Congress in drafting the jurisdictional bar. Section 3730(e)(4)(A) identifies the following sources for disclosures: "a criminal, civil, or administrative hearing, . . . a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or . . . the news media . . . ." The prevailing view is that this list constitutes an exhaustive rendition of the possible sources. We agree. As explained by the Eleventh Circuit, we may safely assume that Congress knew what it was doing when it crafted the FCA:

The list of methods of "public disclosure" is specific and is not qualified by words that would indicate that they are only examples of the types of "public disclosure" to which the jurisdictional bar would apply. Congress could easily have used "such as" or "for example" to indicate that its list was not exhaustive. Because it did not, however, we will not give the statute a broader effect than that which appears in its plain language.

United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1499–1500 (11th Cir. 1991); see also United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1004 (10th Cir. 1996) (holding that § 3730(e)(4)(A) "defines the sources of allegations and transactions which trigger the bar but . . . does not define the only means by which public disclosure can occur"); United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 323 (2d Cir. 1992) ("Section 3730(e)(4)(A) furnishes an exclusive list of the ways in which a public disclosure must occur for the jurisdictional bar to apply."); United States ex rel. LeBlanc v. Raytheon Co., Inc., 913 F.2d 17, 20 (1st Cir. 1990) (Section 3730(e)(4)(A) "does not deny jurisdiction over actions based on disclosures other than those specified . . . .").

The only way to bring the GPR, prepared by the County, within the language of § 3730(e)(4)(A) is for the GPR to be considered an "administrative . . . report." It is unlikely that Congress intended the public disclosure bar to be invoked

20

without limitation as to the content or source of such administrative reports. Indeed, we conclude that Congress was not referring to administrative reports produced by non-federal government sources.

As we determined in our review of the FCA in Stinson, we find that Congress gave us little specific guidance to determine the scope of public disclosure sources, including "administrative reports." It is noteworthy, however, that the terms "report, hearing, audit, or investigation" are modified by the words "congressional, administrative, or Government Accounting Office." The word "administrative" is capable of many meanings. Congress has provided no clear legislative intent or meaning for it in the FCA. We will, therefore, turn to the doctrine of noscitur a sociis, which permits us to treat this word as one which "gathers its meaning from the words around it." Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961); In re Continental Airlines, Inc., 932 F.2d 282, 288 (3d Cir. 1991); 2A Sutherland Statutory Construction § 47:16 (5th ed. 1992). The application of this doctrine is especially appropriate where, as here, "a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." Jarecki, 367 U.S. at 307.

Our reliance upon this maxim leads to the conclusion that "administrative" when read with the word "report" refers only to those administrative reports that originate with the federal government. We take notice of the fact that Congress and the Government Accounting Office are entities of our federal government. We find it hard to believe that the drafters of this provision intended the word "administrative" to refer to both state and federal reports when it lies sandwiched between modifiers which are unquestionably federal in character.

Moreover, a narrow reading of the phrase "administrative . . . report" does not risk the arbitrary results that motivated our decision in Stinson. There we expressed concern that the crabbed interpretation of the word "hearing" proposed by the relator might produce a situation where the jurisdictional question turned on whether a judge was present at a given deposition. Stinson, 944 F.2d at 1157. Here, in contrast, we have good reasons to treat

21

reports made by the federal government differently from those produced by state or local governments or by private individuals. Ordinarily, the party accused of defrauding the federal government is in control of most of the sources of information that would effectively reveal wrongdoing. This information dynamic was, in large part, a motivating factor behind the 1986 amendments. Congress emphasized its belief that "[d]etecting fraud is usually very difficult without the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity." S. Rep. 99-345, 99th Cong., 2nd Sess. 4, reprinted in 1986 U.S.C.C.A.N. 5269. Additionally, the Reporting Committee perceived the existence of "a conspiracy of silence" to defraud the federal government. Id. at 6, reprinted in 1986 U.S.C.C.A.N. at 5271.

In these circumstances, the federal government is ill-equipped to protect itself by having certain information in its possession. When, as in this case, the defrauding party is a local government entity required to submit reports to the federal government, those reports have been compiled and produced by a party whose principal motivation (assuming the truth of the fraud claim) is the elimination of the paper trail of fraud. If state and local government reports were treated as administrative reports under the Act, the jurisdictional bar might be invoked through information submitted by those bent on convincing a federal agency that no fraud, in fact, was occurring. That problem is especially evident here where the County's GPR is the only source from which the public could have learned of the County's misrepresentations to the federal government.

Moreover, a broad reading of "administrative reports" would be fundamentally inconsistent with the purpose and tenor of the 1986 amendments. Congress undertook the amending of the FCA to eliminate the draconian "government knowledge" standard applied since 1943. This standard barred all actions where it could be shown, no matter how attenuated the case, that the information on which the qui tam suit was based had passed into the possession of the federal government prior to the suit's filing. See S. Rep. No. 345, 99th Cong., 2d Sess. 10-13,

22

reprinted in 1986 U.S.C.C.A.N. 5266, 5275-78 (discussing inter alia United States ex rel. Wisconsin v. Dean, 729 F.2d 1100 (7th Cir. 1984), where it was held that the state of Wisconsin could not maintain an action based entirely on that state's investigations of the defendant because the state had conveyed the same information to federal agencies in routine disclosures required by federal law). Concerned about the "conspiracy of silence" and the prevalence of fraud, Congress sought to reforge the balance between over- and under-deterrence. See S. Rep. No. 345, 99th Cong., 2d Sess. 6, reprinted in 1986 U.S.C.C.A.N. at 5271. The principal intent of the 1986 amendments was to "have the qui tam suit provision operate somewhere between the almost unrestrained permissiveness represented by the Marcus decision and . . . the restrictiveness of the post-1943 cases, which precluded suit even by original sources." Stinson, 944 F.2d at 1154.

The expansion of the FCA's definition of "administrative report" to state and local government reports would in effect return us to the unduly restrictive "government knowledge" standard. There is no suggestion that HUD had any access to information about the misrepresented state of facts beyond what the County submitted in its 1992 GPR. Nor is there evidence of any government investigation based on this information prior to the airing of Dunleavy's allegations. Although under the Stinson standard, this information is potentially accessible by any citizen willing to proceed under the Freedom of Information Act, 5 U.S.C. § 552 et seq., we cannot overlook the fact that Stinson dealt with information produced on the public record in connection with litigation while here we are concerned with reports that may be filed away without the receiving agency being put on notice that there is any reason to give them close attention.14

For the above reasons, we conclude that Congress meant to bar reliance only on "administrative reports" originating with the federal government. Since the 1992 GPR was

_____

14. We do not by this suggest that Stinson's "potential availability" standard never applies outside the context of litigation. We only posit the dangers of extending its reach to the context now before us.

23

prepared by or at the behest of Delaware County, it is not a source of public disclosure contemplated by Congress. Because we have answered the first part of our inquiry in this manner, we do not need to go on to the issue of the extent of disclosure.

**III. Conclusion**

We reaffirm our holding in <u>Stinson</u> that "[s]ection 3730(e)(4) applies only when information has been publicly disclosed through an enumerated method prior to the filing of a <u>qui tam</u> suit based on that information." 944 F.2d at 1176. However, the facts of this case differ significantly from <u>Stinson</u>. We read 30 U.S.C. § 3730(e)(4)(A)'s reference to "administrative reports" as barring only those actions based on administrative reports that originate with the federal government. Because the 1992 GPR is the only source which would reveal that Delaware County had not fulfilled its reporting obligation to HUD, we must conclude that not all essential elements of the fraud have been publicly disclosed. We will, therefore, reverse the decision of the district court and remand this matter to it for further proceedings consistent with this opinion.

A True Copy:
Teste:


<u>Clerk of the United States Court of Appeals</u>
<u>for the Third Circuit</u>

24