**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 10 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

THE UNITED STATES OF
AMERICA, ex rel. TODD AAKHUS,
personal representative of the Estate of
Miles Aakhus,

      Plaintiff-Appellant,

v.

DYNCORP, INC.,

      Defendant-Appellee.

No. 97-2017

---

Appeal from United States District Court
for the District of New Mexico
(D.C. No. CIV-92-1435)

---

Duff H. Westbrook (Maureen A. Sanders with him on the brief), Sanders &
Westbrook, P.C., Albuquerque, New Mexico, for the appellant.

Peter J. Adang, Peter J. Adang, P.C., Albuquerque, New Mexico, for the appellee.

---

Before KELLY, BARRETT, and BRISCOE, Circuit Judges.

---

BRISCOE, Circuit Judge.

---

Relator Todd Aakhus, personal representative of the Estate of Miles Aakhus, appeals the district court's entry of a directed verdict in favor of DynCorp, Inc., on qui tam claims under the False Claims Act, 31 U.S.C. §§ 3729-33. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.

From approximately 1974 through September 1990, DynCorp operated and maintained, under contract with the federal government and using government equipment, the Radar Target Scatter (RATSCAT) facility at the United States Army White Sands Missile Range in New Mexico. DynCorp was required to track and control government-issued property, including additions and deletions in inventory that occurred each year. At the end of each fiscal year, DynCorp submitted a report of inventoried property, listing additions and deletions during the preceding year. It was the government's responsibility to audit and verify the accuracy of DynCorp's property inventory records. Specifically, the Defense Contract Administration Services Management Area performed quarterly or semi-annual audits of the records, physically checking the records against inventoried items to insure that the records were accurate. Between 1974 and 1990, the government issued over 8,100 property items to DynCorp. As of July 1990, DynCorp possessed approximately 5,700 inventory items with an original value of approximately $25 million.

DynCorp was paid on a "cost-plus" basis, and the government reimbursed DynCorp for its costs of operating the RATSCAT facility. In addition, the government reviewed DynCorp's performance on a semi-annual basis and awarded DynCorp a fee based on the perceived quality of its work. Approximately five percent of the semi-annual award fee was based on a "general" category encompassing property management, logistics, quality assurance, and training.[1] During each semi-annual review period, DynCorp was allowed to make a presentation concerning its performance to the award fee review board. DynCorp received an award fee of $171,819 for October 1989 through March 1990, and $151,047 for April 1990 through September 1990 (the end of DynCorp's contract).

Miles Aakhus was hired by DynCorp as a systems engineer. He was subsequently transferred to the administrative department and was assigned the role of office automation coordinator, where he was responsible for installation of hardware and software on personal computers as well as the design and maintenance of personal computer software. During late summer or early fall of 1989, Miles Aakhus used dBASE III PLUS (relational database management software) to design a new inventory tracking system for the facility. The purpose

---

[1] Witnesses at trial were unsure how the five percent was allocated among the four categories.

of the new system was to allow inventory records to be maintained at the facility rather than on an off-site corporate computer, and to allow DynCorp to track inventory using a bar coding system. In the fall of 1989, Miles Aakhus transferred the inventory records from a computer in DynCorp's corporate offices to the new system installed on a personal computer at the facility. After a brief testing period, the system became the operational system used by DynCorp to internally track inventory.

According to Miles Aakhus, DynCorp conducted a physical inventory between December 1989 and February 1990, during which DynCorp employees attempted to place adhesive bar code stickers on all inventory items and simultaneously scan each item of inventory into the new computer database. Beginning in late December 1989 or early January 1990, Miles Aakhus' supervisor, Dolores Stoll, asked him to print a missing items report on a weekly basis. According to Miles Aakhus, Stoll distributed copies of the report to various DynCorp employees responsible for the missing items so they could conduct physical searches for the missing items. The first report allegedly listed 818 missing items. As of March 1, 1990, the report allegedly listed 519 missing items.

There were two methods for deleting inventory items from Miles Aakhus' inventory system. The "normal" method allowed users to delete items by bar code

number or DynCorp number (DynCorp assigned a unique number to each inventory item, separate from the bar code number). To utilize this method, users were required to key in a deletion voucher number for the item to be deleted. Deletion vouchers were internally issued by DynCorp to keep track of deletions from inventory. When a user utilized the normal method of deletion, Miles Aakhus' system removed the item from the master inventory file and simultaneously created a new record in what Miles Aakhus named the "deleto" file. Each record in the "deleto" file contained information about the item deleted, including the deletion voucher number. The second method for deleting items, referred to as the "Control U/Pack" method, required users to exit from the main menu to a DOT prompt. The user typed "Browse," hit the enter key, and the database appeared on the computer screen. The user highlighted the particular item to be deleted and holding down the control key, typed "U". A small indicator appeared on screen indicating the record was a candidate for deletion. The user then hit the Escape key and typed "Pack." This caused the system to delete the highlighted item from the database. Unlike the normal method of deletion, the Control U/Pack method did not require a user to key in a deletion voucher number and it did not create any record in the "deleto" file. It simply deleted the item from the master inventory file. It is uncontroverted that the

Control U/Pack method was faster than the normal method because it allowed users to delete multiple items at the same time.

Only Miles Aakhus and Ted Duran, DynCorp's property clerk, knew how to use the normal method for deleting inventory items. Miles Aakhus testified in his deposition that he informed Stoll about the existence of the Control U/Pack method sometime in 1990. He further testified that sometime between March 1, 1990, and July 1, 1990, Stoll asked him to instruct other DynCorp employees (Angie Ramirez, Vicky Holly, Angie Batig, and Faye Harriston) on how to use the Control U/Pack method of deletion because the normal method was too slow. Stoll denies knowing anything about the Control U/Pack method of deletion prior to October 1990 and further denies instructing Miles Aakhus to teach anyone to use it. Miles Aakhus testified that he personally observed several employees delete inventory items using the Control U/Pack method and Stoll was present on at least one of those occasions. Miles Aakhus acknowledged he did not ask why the employees were deleting items and he could not say they did not have authorization to delete the items.

In July 1990, Earl Thompson, division manager for DynCorp at the RATSCAT facility, announced DynCorp had lost the contract to operate and maintain the facility. Thus, DynCorp had to finish its operations so the winning bidder, EG&G, could take over the facility as of October 1, 1990. According to

-6-

Guy Galloway, the phase-out coordinator, DynCorp employees were under "extreme time pressure" to finish up the inventory and get the inventory information transferred to EG&G. Miles Aakhus testified that on September 27 and 28, 1990, Stoll asked him to delete items from the inventory database using the Control U/Pack method. He testified that Stoll watched over his shoulder as he performed the deletions and appeared to be directing him to delete items she saw on the computer screen. Miles Aakhus acknowledged Stoll told him she had authority from Captain Joliffe, a government contracting officer representative, to remove the items from the database. Miles Aakhus did not know whether deletion vouchers had been issued for any of the items.

EG&G hired many DynCorp employees to continue in their positions. Although Miles Aakhus sought employment with EG&G, he was not extended an offer. On August 27, 1990, his wife wrote to EG&G on behalf of Miles Aakhus, offering computer consultant services at the rate of $130 per hour, but that offer was not accepted.

On his last day of work, September 28, 1990, Miles Aakhus assisted Stoll and Galloway in printing an inventory list. According to Ted Duran, the property clerk for DynCorp, Miles Aakhus subsequently worked alone on the property computer for approximately two and one-half hours. Duran testified he observed Miles Aakhus deleting information from the inventory, although Duran was

unsure what the information was.  Duran testified that Miles Aakhus shut off the computer, retrieved his briefcase, and left the facility.  In his deposition, Miles Aakhus acknowledged he took computer disks containing the property inventory system he had developed for DynCorp when he left the facility on September 28, 1990.  Included on those disks were all of the programs comprising the system, as well as the database of inventory information.

On October 1, 1990, the first day of EG&G's operation of the facility, Duran had problems starting up the property computer that contained the inventory system.  He tried to contact Miles Aakhus at home but Miles Aakhus refused his calls and would not return his calls.  Stoll hired Larry Vandine, a computer consultant, to work on the computer.  Although Vandine fixed the system so it would work, Duran testified they continued to have problems.  According to Duran, a primary problem occurred when they transferred a piece of property from one account to another (i.e., from one department to another), as the system would erase the record of that item and the data would be lost.  Ultimately, EG&G quit using the inventory system and obtained a new inventory program.

At the conclusion of its contract, DynCorp submitted a missing items report for sixty-one items, and the government accepted this representation.  Frank Drews, DynCorp's property administrator, remained on-site at the facility and

located fifty-three of the missing items. On November 6, 1990, Barbara Miracle, the government's property administrator, sent a letter to DynCorp granting relief from accountability for the eight missing items.

Miles Aakhus filed this complaint on December 17, 1992, alleging DynCorp improperly deleted 519 items of inventory valued at $1,380,599.18 from the computer database, that allegedly appeared on the March 1, 1990, missing property list. It was apparently Miles Aakhus' theory that DynCorp, through Stoll and other employees, used the Control U/Pack method to delete the 519 items without authorization from the government. Miles Aakhus died in February 1995 and his son took over the litigation. At some point, either Miles Aakhus or his son realized the original claim of 519 missing items was incorrect. At trial, Miles Aakhus' son, acting on his behalf as the relator, alleged 209 items with an original value of approximately $131,903.56 were missing and had been improperly deleted. He arrived at his conclusions by comparing various computer records and reports he received during the litigation.

Various DynCorp employees, most notably Drews and Duran, testified that the 209 items were not in fact missing nor were they deleted without authorization. According to Drews, all of the 209 items were present on a September 1989 inventory produced prior to DynCorp shifting to Miles Aakhus' inventory program. Approximately 140 of the items were various items of metal

furniture DynCorp had acquired over the years from the government.  In the spring of 1990, the government remodeled the RATSCAT facility and replaced all of the furniture.  Duran testified he personally turned over the old furniture to a government agency responsible for salvaging old government equipment and in turn received authorization to delete the furniture.  Similarly, approximately 14 of the 209 items were old computer disk packs for which DynCorp had received authorization to destroy and delete.[2]  The relator reduced his claim to 205 missing items at trial.  DynCorp alleges witnesses were able to specifically account for approximately 176 of the items, leaving approximately 29 missing items.[3]  However, in his reply brief, the relator alleges this evidence is supported by exhibits admitted over his objections.

## II.

We review the district court's grant of a directed verdict de novo, applying the same standard used by the district court.  Oja v. Howmedica, Inc., 111 F.3d 782, 792 (10th Cir. 1997).  A directed verdict is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, points but one way

---

[2]  There is evidence indicating DynCorp had authorization to delete all 18 computer disk packs but on appeal DynCorp suggests it could only locate documentation pertaining to 14 of the disk packs.

[3]  Although the government was responsible for maintaining the official property records for RATSCAT, many of those records were either lost or destroyed after 1990.  Thus, DynCorp was placed in the difficult position of having to justify the whereabouts of various property items without having records.

and is susceptible to no reasonable inferences supporting the nonmoving party. Id. However, a mere scintilla of evidence is insufficient to create a jury question. Id.

Before specifically addressing the claims, we pause briefly to outline the mechanisms provided in the False Claims Act (FCA). "The FCA sets out civil and criminal penalties for persons who knowingly submit false claims to the government." United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 738 (3d Cir. 1997); see also Avco Corp. v. United States Dept. of Justice, 884 F.2d 621, 622 (D.C. Cir. 1989) (FCA "is the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government."). "A private person with knowledge of fraud against the government, acting as a de facto 'attorney general,' can instigate litigation on the government's behalf against the parties responsible. Such suits are known as qui tam actions." Dunleavy, 123 F.3d at 738. The FCA provides a built-in incentive for the private plaintiff, referred to as the relator, to bring suit. Id. Specifically, the FCA provides the relator shall receive between fifteen and thirty percent of the proceeds of the action, plus reasonable expenses, fees, and costs. 31 U.S.C. §§ 3730(d)(1), (2).

*Claim under 31 U.S.C. § 3729(a)(4)*

The relator contends the district court erred in concluding there was insufficient evidence to support his claim under 31 U.S.C. § 3729(a)(4), which makes it unlawful for any person who

> has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt.

We have found one published case discussing this subsection of the FCA. See United States ex rel. Stinson v. Provident Life & Accident Ins. Co., 721 F. Supp. 1247, 1259 (S.D. Fla. 1989). Based upon the plain language of (a)(4), we agree with Stinson that the essential elements of a cause of action thereunder include (1) possession, custody, or control of property or money used, or to be used, by the government, (2) delivery of less property than the amount for which the person receives a certificate or receipt, (3) with intent to defraud or willfully to conceal the property. Although Stinson suggests a plaintiff must also prove damages suffered by the government, there is authority to the effect that the government need not prove damages to establish liability under the FCA, but can instead recover statutory penalties for a violation even absent any damages. See John T. Boese, Qui Tam: Beyond Government Contracts, 456 Practicing Law Institute/Litigation and Administrative Practice Course Handbook Series 7, 32

(March 1993). We find it unnecessary to decide whether proof of damages is an essential element under (a)(4) because, as discussed below, the relator here cannot satisfy one of the other essential elements of his claim.

After carefully reviewing the record on appeal, we conclude there is no evidence demonstrating DynCorp received any type of certificate or receipt from the government within the meaning intended by (a)(4). Although the relator contends DynCorp received a receipt each time it was issued a piece of property from the government, the record on appeal does not support this. At best, the record indicates DynCorp employees created internal receiving records each time they received an item of property from the government. In our view, the language of (a)(4) clearly suggests the certificate or receipts at issue must be created by the government. We therefore fail to see how the internal records pointed to by the relator can support a claim under (a)(4). Even overlooking this flaw, there is a separate problem with the "receipts" relied upon by the relator. The plain language of (a)(4) makes clear the certificate or receipt at issue must have some connection or relationship to the defendant's return of property.[4] In other words,

---

[4] Assume, for example, a government contractor such as DynCorp is issued twenty metal desks by the government for use in carrying out a government contract. If the government issued a certificate or a receipt to the contractor at the time the desks were returned indicating how many desks were returned, such certificate or receipt would satisfy the provisions of (a)(4) because it would indicate how much property was allegedly returned to the government.

the certificate or receipt must indicate how much property defendant allegedly returned to the government. Here, the "receipts" pointed to by the relator were issued each time DynCorp received items of property from the government. Accordingly, they bear no relation to the amount of property returned by DynCorp to the government at the conclusion of the RATSCAT contract. We conclude the district court properly granted a directed verdict in favor of DynCorp on the relator's claim under (a)(4).

*Claim under 31 U.S.C. § 3729(a)(7)*

The relator contends the district court erred in concluding there was insufficient evidence to support his claim under 31 U.S.C. § 3729(a)(7), which makes it unlawful for any person to "knowingly make[], use[], or cause[] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." This subsection has been referred to as the "reverse false claims provision" of the FCA. Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 565 (8th Cir. 1997). The term "knowingly," as used in (a)(7), "mean[s] that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

"[N]o proof of specific intent to defraud is required." Id.; see also United States v. Krizek, 111 F.3d 934, 941 (D.C. Cir. 1997) (holding an aggravated form of gross negligence, or "gross negligence-plus," is equivalent to reckless disregard for purposes of FCA).

In support of his claim under (a)(7), the relator contends DynCorp employees deleted 205 items from inventory without government authorization prior to the conclusion of DynCorp's contract. The relator contends DynCorp then created and submitted a false record at the end of its contract in order to conceal, avoid, or decrease its obligation to transfer the 205 inventory items to the government upon termination of its contract. To prove his claim, the relator had to demonstrate, in part, that DynCorp deleted the 205 items from inventory without authorization. We have reviewed the record on appeal and conclude the relator failed to present sufficient evidence to allow a reasonable jury to reach such a conclusion. Every witness at trial who was familiar with the DynCorp inventory system testified no items were deleted without authorization. When questioned on cross-examination, Todd Aakhus could not state that DynCorp lacked authorization to delete the items in question from inventory. Although many of the official government records pertaining to DynCorp's inventory had been lost or destroyed, the evidence demonstrated DynCorp specifically received government authorization to delete most of the 205 items at issue. As to the

remaining items, the only evidence presented by the relator that even remotely touched upon the issue of government authorization was Miles Aakhus' deposition testimony that he and other DynCorp employees were directed to use the Control U/Pack method of deletion. Assuming, arguendo, that Miles Aakhus' testimony is sufficient to demonstrate the remaining items were deleted by the Control U/Pack method, we conclude the evidence is not sufficient by itself to allow reasonable jurors to conclude DynCorp lacked government authorization to delete those items.

We also note there was a provision in DynCorp's contract with the government which provided DynCorp was not liable for loss or destruction of government-issued property absent willful misconduct or lack of good faith on the part of DynCorp managerial personnel (namely Earl Thompson, the division manager in charge of the RATSCAT facility). Thus, even if DynCorp had lost or misplaced the items and could not account for their whereabouts, it would not have been contractually liable for those items absent willful misconduct or lack of good faith on the part of Thompson. Because the relator presented no evidence of any such wrongful conduct on the part of Thompson, any failure on the part of DynCorp to include the items on the final inventory listing could not have affected any obligation it had to the government. Thus, there would have been no incentive for DynCorp to submit a false record to the government. We conclude

the district court properly granted a directed verdict in favor of DynCorp on the relator's claim under (a)(7).

*Claim under 31 U.S.C. § 3729(a)(2)*

Subsection (a)(2) of the FCA makes it unlawful for any person to "knowingly make[], use[], or cause[] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2); see United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997). To establish a claim under (a)(2), a person must demonstrate that (1) a "claim" was presented to the government by the defendant, or the defendant "caused" a third party to submit the "claim," (2) the claim was "false or fraudulent," (3) the defendant presented the claim knowing it was "false or fraudulent," and (4) the defendant made or used a false statement which the defendant knew to be false, and which was causally connected to the false claim. See generally Rabushka, 122 F.3d at 563; Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1043 (Fed. Cir. 1994).

The relator contends DynCorp violated (a)(2) by seeking and receiving award fees that included a component for property management when, in fact, DynCorp was unable to account for many missing items. More specifically, the relator alleges DynCorp represented to the review board that they were

performing adequately in the area of property management when, in fact, they were unable to locate many items of property. The record on appeal reveals the relator failed to introduce any evidence of specific representations made by DynCorp to the board (or to any other government official or agency) concerning its performance with regard to property management. Although the testimony at trial indicated DynCorp had the right to make a "sales pitch" concerning its performance, there was no evidence whatsoever that DynCorp did so. More specifically, there was no evidence DynCorp made any representations to the board concerning its performance in property management. Thus, there is no evidence DynCorp made any false claim or statement to the government to receive payment on a false claim. Accordingly, we conclude the district court properly granted a directed verdict on the relator's claim under (a)(2).

*Remaining arguments*

Because we conclude the relator failed to present sufficient evidence to support any of his claims, we find it unnecessary to address his remaining issues.

III.

The judgment of the district court is AFFIRMED.