202 F.3d 1238 (9th Cir. 2000)
 A-1 AMBULANCE SERVICE, INC., a corporation, aka Seal 1; DENNIS B. BARRETT, an individual, Plaintiffs-Appellants,
v.
STATE OF CALIFORNIA, a political subdivision, aka Seal A; DANIEL SMILEY, Deputy Director, California State Emergency Medical Services Authority; THE COUNTY OF FRESNO; K W P H ENTERPRISES, dba American Medical Services; SAM KARAS; OPINION TOM PERKINS; BRIAN SINNOTT, Defendants, and COUNTY OF SAN MATEO; MEDTRANS, dba Hartson Medical Services, dba Baystar; COUNTY OF MONTEREY, a political subdivision; PENINSULA PARAMEDIC SERVICES, INC., a corporation, Defendants-Appellees.
 No. 98-15200
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 5, 1999
Decided February 7, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Mark D. Polston, Washington, D.C., and Eugene Dong, Palo Alto, California, Attorneys for A-1 Ambulance Services, Inc. and Dennis B. Barrett.
 Douglas C. Holland and William K. Rentz, Deputy County Counsel, Salinas, California, Attorneys for County of Monterey.
 Brenda Carlson, Deputy County Counsel, Redwood City, California, Attorneys for County of San Mateo.
 R. Michael Scarano, Jr., Michael G. McCarty, and Diane M. Racicot, Foley & Lardner, Los Angeles, California, Attorneys for Med-Trans, Hartson Medical Services, BayStar Medical Services and Peninsula Paramedic Services, Inc.
 Diana Younts, United States Department of Justice, Washington, D.C., Attorney for the United States.
 Appeal from the United States District Court for the Northern District of California; James Ware, District Judge, Presiding. D.C. No. CV-96-20048-JW
 Before: Alex Kozinski and Sidney R. Thomas, Circuit Judges, and Johnnie B. Rawlinson,[1] District Judge.
 THOMAS, Circuit Judge:
 
 
 1
 A-1 Ambulance Service, Inc. ("A-1") appeals the district court's dismissal of its qui tam action against the County of San Mateo, the County of Monterey, and two private ambulance companies for alleged violations of the False Claims Act, 31 U.S.C. SS 3729-3733. The district court dismissed A-1's action for lack of subject matter jurisdiction under the "public disclosure bar" of 31 U.S.C. S 3730(e)(4)(A) because A-1's action was based upon information publicly disclosed in local government administrative hearings. We have jurisdiction under 28 U.S.C. S 1291, and we affirm.
 
 
 2
 * A-1 was an unsuccessful bidder for public contracts to provide exclusive ambulance services within certain California counties, including San Mateo and Monterey Counties (the "Counties"). Med-Trans and Peninsula Paramedic Services, Inc. ("Pen-Med") are the two private ambulance service providers that were awarded those exclusive contracts in San Mateo and Monterey Counties respectively. In its qui tam action, A-1 essentially alleges that the Counties, together with Med-Trans and Pen-Med, conspired to shift some of the costs of emergency ambulance services from the Counties to Medicare in violation of the anti-kickback provisions of the Medicare Act, 42 U.S.C. S 1320a-7b(b). To fully understand A-1's claim, however, some background information is required.
 
 
 3
 In California, pre-hospital emergency medical services ("EMS"), such as ambulance and paramedic services, are regulated by the Emergency Medical Services System and Prehospital Emergency Medical Care Personnel Act ("EMS Act"). See Cal. Health & Safety CodeSS 1797-1799.201 (West 1990 & Supp. 1999). Under the EMS Act, individual counties are authorized to designate local EMS agencies to administer emergency medical services programs within their respective jurisdictions. The EMS agencies are required to develop and administer a plan for providing emergency medical services to all of its county's residents, including ambulance services for the indigent population. Both Counties in this case designated their respective health departments as their local EMS agencies.
 
 
 4
 Pursuant to the EMS Act, each EMS agency may create one or more exclusive operating areas within its county for the delivery of emergency ambulance services. See id. SS 1797.85, 1797.224. The exclusive operating area contracts are awarded through a competitive bidding process in which the EMS agencies solicit bids from prospective ambulance service providers. The invitation for bids is commonly referred to as a Request for Proposal ("RFP"). The selection process requires several rounds of public administrative hearings, beginning with the dissemination of an RFP for public review and comment, and concluding with the actual selection of an EMS provider by each county's governing body, the Board of Supervisors. As they were legally required to do, both Counties utilized this competitive bidding process to select their respective EMS providers.
 
 
 5
 * Beginning in 1994, Monterey County initiated efforts to redesign its EMS program. Between September and December of that year, Monterey County's four Regional Councils, which were advisory committees to Monterey County's EMS agency, conducted several public meetings to discuss draft RFPs. The Monterey County Board of Supervisors then considered these RFPs on December 6, 1994, at a public meeting attended by, among others, A-1. After holding additional hearings and receiving public comment, the Board approved a final RFP in March of 1995.
 
 
 6
 The final RFP, which became part of the official public record, provided for a single countywide exclusive operating area and described the primary terms and conditions of the ambulance service contract to be awarded, including the types andamounts of charges permitted to Medicare and other third-party payors. The final RFP also requested that bidders propose the amount of subsidy they believed they would require to cover the costs of non-chargeable or uncollectible ambulance services. After publicly noticing and circulating the final RFP, Monterey County held a bidders conference on April 19, 1995. At the public conference, potential bidders raised the issue of Medicare reimbursement and whether it would be sufficient at the maximum allowable rates specified in Monterey County's RFP. After the conference, three EMS providers, including A-1 and Pen-Med, responded to Monterey County's RFP.
 
 
 7
 Thereafter, a bid review committee recommended the selection of Pen-Med as Monterey County's EMS provider. The Board accepted the recommendation and ratified the contract with Pen-Med in two separate public hearings held in September of 1995. At both those hearings, the Board discussed the issues of Medicare reimbursement and a subsidy for uncollectible ambulance services. Ultimately, Monterey County agreed to provide a $450,000 subsidy to Pen-Med to help defray the costs of non-chargeable and uncollectible ambulance services.
 
 B
 
 8
 San Mateo County began searching for a new EMS provider in 1990. In March of that year, the director of San Mateo County's EMS agency sent a proposed draft RFP to the Board of Supervisors. The proposed RFP stated that ambulance services would be supported by user fees only, without any county subsidy. It also set the maximum rates that the selected EMS provider would be permitted to bill Medicare and other third-party payors. The Board convened a public hearing on March 27, 1990, to consider the draft RFP. It approved the RFP, which became part of the official public record, and released it to the public for review and comment.
 
 
 9
 On May 9, 1990, San Mateo County conducted a public bidders conference. At the conference, San Mateo County representatives were asked whether San Mateo County would reimburse the costs of ambulance services for indigent patients. The San Mateo County officials indicated that there would be no reimbursement. On July 3, 1990, three ambulance companies submitted proposals to the RFP. The proposals were evaluated by a review committee and then discussed at three separate public Board meetings. The Board ultimately selected Med-Trans as its EMS provider, and the contract with Med-Trans was made part of the public record. Like the RFP, the contract stated that San Mateo County was providing no subsidy for any of the ambulance services rendered by Med-Trans.
 
 C
 
 10
 A-1 alleges that the Counties' ambulance service contracts perpetrate a fraud upon the federal government in violation of the False Claims Act. In a nutshell, A-1 contends that the costs of providing ambulance services to county-responsible indigents are unlawfully shifted from the Counties to private and third-party payors, including the federal Medicare program. Such unlawful cost-shifting occurs, A-1 argues, because the Counties' ambulance service contracts offer little or no subsidy to cover the costs of ambulance services for their indigent populations. According to A-1, therefore, MedTrans and Pen-Med are forced to charge artificially inflated rates to Medicare-covered patients in order to offset the losses incurred when rendering ambulance services to indigent patients. As a result, A-1 claims that the Counties' ambulance service contracts effectively compel the federal government, in violation of the Medicare Act, to subsidize ambulance services at "exorbitant" rates for indigent patients who are otherwise ineligible for Medicare benefits.
 
 
 11
 The district court concluded that the False Claims Act's public disclosure bar deprived it of jurisdiction, and granted the Counties' motion to dismiss. We review that decision de novo. See UnitedStates ex rel. Aflatooni v. Kitsap Physicians Servs., 163 F.3d 516, 520 (9th Cir. 1999). We review the district court's findings of fact relevant to its determination of subject matter jurisdiction for clear error. See United States ex rel. Biddle v. Board of Trustees of Leland Stanford, Jr. Univ., 161 F.3d 533, 535 (9th Cir. 1998), cert. denied , 119 S. Ct. 1457 (1999). The question of whether a particular disclosure triggers the jurisdictional bar of S 3730(e)(4)(A) is a mixed question of law and fact, which we review de novo. See United States ex rel. Lindenthal v. General Dynamics Corp., 61 F.3d 1402, 1409 n.9 (9th Cir. 1995).
 
 II
 
 12
 The False Claims Act deprives a district court of jurisdiction over any qui tam action that is based upon allegations or transactions already disclosed in certain public fora, unless the relator is the original source of the information underlying the action. The relevant section, 31 U.S.C. S 3730(e)(4)(A), provides: No court shall have jurisdiction over an action under this section based upon the public disclosure of alle gations or transactions in a criminal, civil, or admin istrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
 
 
 13
 The public disclosure bar contained in S 3730(e)(4)(A) sets up a two-tiered inquiry. First, we must determine whether there has been a prior "public disclosure" of the "allegations or transactions" underlying the qui tam suit. See United States v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1018 (9th Cir. 1999). If and only if there has been such a public disclosure, we next must inquire whether the relator is an "original source" within the meaning of S 3730(e)(4)(B). See id. Because A-1 neither qualifies as nor alleges to be an "original source," the dispositive question presented on appeal is whether the "allegations or transactions" underlying A-1's fraud claim have been "publicly disclosed."
 
 
 14
 The public disclosure question, in turn, requires that we make two distinct but related determinations. First, we must decide whether the public disclosure originated in one of the sources enumerated in the statute. Under S 3730(e)(4)(A), public disclosure can occur in one of three categories of fora: (1) in a "criminal, civil, or administrative hearing," (2) in a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, " or (3) in the "news media." 31 U.S.C. S 3730(e)(4)(A).
 
 
 15
 If there has been public disclosure through one of these sources, we must then determine whether the content of the disclosure consisted of the "allegations or transactions" giving rise to the relator's claim, as opposed to "mere information." Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1473 (9th Cir. 1996). However, the substance of the disclosure need not contain an explicit "allegation" of fraud; the jurisdictional bar is raised so long as the material elements of the allegedly fraudulent "transaction" are disclosed in the public domain. See id. (citing United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994)). We conclude that the district court correctly dismissed A-1's suit for lack of jurisdiction because the underlying "transactions" that A-1 claims are fraudulent had already been publicly disclosed in local "administrative hearing[s]."
 
 
 16
 * The extensive public agency proceedings conducted by the Counties plainly fall within the ambit of "administrative hearing[s]" under S 3730(e)(4)(A). In the first place, it is axiomatic that agency actions are inherently "administrative." Thus, we cannot view the official actions of a local EMS agency and its governing entity, the Board of Supervisors, as anything other than "administrative" in nature. Moreover, the numerous public proceedings conducted by these agencies certainly qualify as "hearing[s]" within the meaning of the False Claims Act. "Hearing" in this context is synonymous with "proceeding," see Springfield Terminal Ry., 14 F.3d at 652, and, for purposes of raising the public disclosure bar, encompasses publicly-filed documents, "even if they are not the subject of a hearing." Alcan Elec. & Eng'g, Inc., 197 F.3d. at 1020; accord Hagood, 81 F.3d at 1474 n.13 ("That documents filed with an agency or court during administrative proceedings or civil litigation are considered publicly disclosed is a firmly established principle.").
 
 
 17
 In this case, public disclosure through administrative hearings was deliberate and not incidental. In fact, public disclosure was unavoidable because the competitive bidding process used to award exclusive operating area contracts necessarily entailed several public administrative proceedings, beginning with the public dissemination of RFPs and concluding with the selection of an EMS provider by each County's Board of Supervisors. Furthermore, as required by California law, these agency proceedings were made open to public attendance and actually invited, as well as received, public comment. In addition, all documents relevant to these agency proceedings were openly distributed and made part of the official public record. Thus, in light of the numerous agency proceedings held by the Counties and the inherently public nature of the bidding process, we are compelled to conclude that public disclosure occurred in this case through administrative hearings.
 
 
 18
 In so holding, we necessarily reject A-1's cramped view of what constitutes an "administrative hearing " for purposes of applying the public disclosure bar. According to A-1, an administrative hearing within the meaning of S 3730(e)(4)(A) is confined to a "proceeding at which issues of fact concerning fraud are investigated and resolved while evidence, either in documentary or oral form, is presented." Nothing in the text of S 3730(e)(4)(A), however, demands such a crabbed interpretation. Indeed, the provision provides no basis for concluding that local government agency proceedings, such as the ones that took place here, are somehow stripped of their "administrative" nature or deprived of their status as "hearings" just because they may not involve fraud investigations or evidentiary presentations.
 
 
 19
 We further reject A-1's contention that administrative hearings must be federal in order for the public disclosure bar to apply. The unambiguous text of the first category of public fora described in S 3730(e)(4)(A) does not contain any federal limitation. Congress could have easily limited the public disclosure bar to "federal criminal, civil, or administrative hearings," but chose not to do so. If the statutory language is clear, that is the end of our inquiry. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). We will not add a term to the statute that Congress elected not to include. United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734 (3d Cir. 1997), which considered a related issue, is not to the contrary. In that case, the Third Circuit faced the question of whether a report prepared by Delaware County constituted an "administrative report" within the meaning of S 3730(e)(4)(A). See id. at 744. In doing so, the court was required to construe the second category of public fora listed in the statute, that is "a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." The court concluded that the term " `administrative' when read with the word `report' refers only to those administrative reports that originate with the federal government." Id. at 745. In contrast, this case requires us to interpret a different phrase in the statute, one unadorned with any of the "federal" modifiers that were central to the Third Circuit's analysis in Dunleavy. Thus, as a matterof statutory construction, the two questions are far divergent, and Dunleavy did not reach the issue confronting us in this case. Indeed, Dunleavy's interpretation buttresses our conclusion because one may presume that Congress acted intentionally in including the modifying language in one clause, but omitting it in another. See Kim v. United States, 121 F.3d 1269, 1276 (9th Cir. 1997). It is unlikely that Congress would have referenced administrative hearings twice in the same sentence, unless it intended to allude to different contexts.
 
 
 20
 For all these reasons, we conclude that the local agency proceedings in this case were "administrative hearings" within the meaning of S 3730(e)(4)(A).
 
 B
 
 21
 The content of the disclosures at the administrative hearings consisted of the essential "transactions " underlying A-1's fraud claim. Contrary to what A-1 suggests, the information publicly disclosed in the local agency proceedings contained the material facts underlying A-1's allegation of fraud. In the course of the local agency proceedings, there was public disclosure of the following material facts: (1) the amount, if any, of county subsidies under the exclusive operating area contracts, (2) the fact that the Counties would not otherwise be billed for services rendered to indigent patients, (3) the maximum allowable rates that the EMS providers could charge Medicare and other third-party payors, and (4) the issue of whether Medicare reimbursement would be sufficient at the maximum allowable rates specified by the contracts. In short, all the material transactions giving rise to the Counties' allegedly unlawful cost-shifting schemes were publicly disclosed. That the disclosed transactions themselves may not have pointed directly to any wrongdoing is simply of no moment. See Hagood, 81 F.3d at 1473-74.
 
 
 22
 For this reason, we must also reject A-1's contention that its unique knowledge removed the jurisdictional bar. There is no such exception in the statute; the public disclosure bar is triggered by disclosure of "allegations or transactions." 31 U.S.C. S 3730(e)(4)(A). "A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." United States ex rel. Findley v. FCP-Boron Employees' Club , 105 F.3d 675, 688 (D.C. Cir. 1996). The mere fact that A-1's own expertise in the area of emergency ambulance services may have enabled it to formulate its novel legal theory of fraud is irrelevant to the question of whether the material transactions giving rise to the alleged fraud were already disclosed in the public domain in the first place. "If a relator merely uses his or her unique experience or training to conclude that the material elements already in the public domain constitute a false claim, then a qui tam action cannot proceed. " Id. In sum, "fairly characterized," A-1's claim merely "repeats what the public already knows." Wang v. FMC Corp., 975 F.2d 1412, 1417 (9th Cir. 1992).
 
 III
 
 23
 Because the material transactions underlying A-1's fraud claim were publicly disclosed in local government administrative hearings, the False Claims Act deprived the district court of jurisdiction to hear A-1's qui tam action. Accordingly, we affirm the district court's decision dismissing A-1's suit for lack of subject matter jurisdiction. AFFIRMED
 
 
 
 Notes:
 
 
 [1]
 The Honorable Johnnie B. Rawlinson, United States District Judge for the District of Nevada, sitting by designation.