**UNITED STATES of America and State of California, ex rel. John Dale HANSEN, Plaintiffs,**

v.

**CARGILL, INC., et al., Defendants.**

**No. C98–4367CRB.**

United States District Court, N.D. California.

July 24, 2000.

**1174**

Alex G. Tse, U.S. Attorney's Office, San Francisco, CA, for USA.

Daniel Robert Bartley, Daniel Robert Bartley Law Offices, Novato, CA, for John Dale Hansen.

Tom Blake, State Attorney General's Office, San Francisco, CA, for State of California.

Allan J. Joseph, Rogers, Joseph, O'Donnell & Quinn, San Francisco, CA, for Cargill, Inc.

John F. Barg, Landels, Ripley & Diamond LLP, San Francisco, CA, Thomas J. Coaty, Coaty & Stangl S.C., Madison, WI, for Defendants.

## MEMORANDUM AND ORDER

BREYER, District Judge.

This False Claims Act ("FCA") qui tam action arises out of the sale by defendant Cargill, Inc. ("Cargill") of approximately 10,000 acres in the San Francisco North Bay (the "Napa Salt Marshes" or "the Property") to the State of California ("the State") for $10 million dollars. Relator Dale Hansen ("Hansen") alleges that Cargill made false statements to the California and federal governments by submitting an appraisal that valued the Property at $34 million dollars based on its "public interest value."

The State and the United States have declined to intervene in this action. Defendants now move to dismiss on the ground that the Court does not have subject matter jurisdiction because the lawsuit is based upon allegations or transactions that were "publicly disclosed" prior to the filing of this action and plaintiff is not an "original source" within the meaning of the FCA. After carefully considering the papers filed by the parties, and having had the benefit of oral argument, the motion to dismiss is GRANTED.

## BACKGROUND

In 1990 Hansen founded a non-profit California corporation called "Integrity in Natural Resources." The purpose of the non-profit is to promote the integrity of information in the natural resources arena, without advocacy of any other position or philosophy. Hansen is the Executive Director of the organization.

Around the same time as Hansen founded his non-profit, a consent decree settling local, state, and federal claims against Shell Oil Company arising out of an oil spill in Martinez, California established the Shell Oil Litigation Settlement Trustee Committee ("Trustee Committee"). The purpose of the Trustee Committee was to spend $10.8 million dollars paid in settlement of the litigation for environmental preservation. In 1992, the Trustee Committee expressed an interest in purchasing the 10,000–acre Cargill Napa Salt Marshes along the North San Francisco Bay. The salt fields had been inactive since 1990 when Cargill lost its only customer for the salt produced in the North Bay.

In connection with the parties' negotiation of the sale, Cargill provided the Trustee Committee with an appraisal that valued the 10,000 acres at $34 million dollars. The appraisal was prepared by defendant Real Estate Dynamics, Inc. and signed by defendant Craig Hungerford ("the Appraisal"). The Appraisal explicitly disclosed that the appraisers considered the Property's "public interest value" in determining its fair market value. In particular, the appraisers concluded that the highest and best use of the Property is "conservation, development and management of wetland habitat and recreational open space and duck club sites."

The next day Cargill and the Trustee Committee entered into a Memorandum of Agreement ("MOA") outlining the proposed sale for a $10 million dollar purchase price. On June 3, 1993, Cargill and the Trustee Committee issued a press release disclosing that the Property had been appraised at $34 million and that the Appraisal was undergoing public agency review. The Trustee Committee intended to purchase the Property jointly with the State Coastal Conservancy, the State Lands Commission, and the Wildlife Conservation Board ("WCB"). Several news articles about the sale appeared in the press in the following months.

Several government agencies reviewed the sale before it was consummated. For example, after reviewing the Appraisal and other information, the California Department of General Services recommended that the WCB approve the transaction based on a comparison of the $10 million dollar purchase price with similar sales of property for conservation purposes. The State Lands Commission also approved the sale, but only after coming to its own independent conclusion that the Property was worth at least the $10 million dollar purchase price.

The Trustee Committee created a Napa Marsh Advisory Committee to assist the Trustee Committee in deciding whether to complete the sale. In connection with the Advisory Committee's public meetings on the sale, the Trustee Committee received letters from various groups opposing the sale because of the allegedly inflated appraisal value. These groups voiced concern that by overpaying for the Napa Salt Marshes, the Trustee Committee would inflate the price of other lands which the environmental groups hoped the State and other groups would purchase for conservation purposes. Debate as to the value of the Property continued throughout the year. Finally, at a January 6, 1994 Advisory Committee meeting, the Trustee Committee agreed that the final purchase agreement would not include any representations as to the Property's fair value. The sale closed shortly thereafter.

Criticism of the sale did not end after the sale closed. In 1995, Hansen filed a complaint with the California Office of Real Estate Appraisers ("OREA") challenging the Appraisal's use of the public interest value method and accusing Cargill of "fraud, incompetence, and incorrect methodology." The OREA concluded that the Appraisal's use of conservation as a highest and best use was not unlawful. Later that year Hansen (according to his own testimony) persuaded the California Board of Audits to review the State's various land transactions with Cargill, including the validity of the Appraisal for the Napa Salt Marshes. The final audit report, issued two year later, did not conclude that the Appraisal was unlawful.

Finally, on November 10, 1998, Hansen filed this lawsuit under the federal False Claims Act, 31 U.S.C. § 3729, and the California False Claims Act, Cal. Government Code § 12651. The gravamen of Hansen's allegations is set forth in the introduction to the First Amended Complaint:

> This lawsuit is based substantially upon the premise that a so-called "public interest value" appraisal based on a highest and best use of "preservation," "conservation," "natural lands" and the like is *not* an appraisal of "fair market value"[ ] and therefore is bogus, unaccep-

table, and fraudulent for both direct purchase and eminent domain acquisitions.... Through the submission of a document entitled "The Appraisal of the Napa Marsh Prepared for: Cargill, Salt Division, Newark, California," (hereinafter "Hungerford Appraisal") dated May 27, 1993, and signed by appraiser Craig D. Hungerford, of Real Estate Dynamics, Inc., Defendants together made, and conspired to make, false claims that caused Federal and State of California funds to be paid to obtain the Cargill Napa Marsh salt ponds industrial site, purportedly comprising 10,000 acres, situated at the northern end of San Francisco Bay. Defendants had actual knowledge that they were not adhering to applicable standards, that the market value reported in the Hungerford Appraisal was false, and that they therefore were submitting false or fraudulent claims.... At the time of the subject Napa Marsh salt ponds transaction, Cargill had just completed another sale to the State of California of Cargill's 19.5 acre New Chicago Marsh property, at the southern end of the San Francisco Bay.... In the course of such New Chicago Marsh transaction, the Office of Real Estate Design Services ("OREDS") of the California Department of General Services rejected an appraisal submitted by Cargill which was based upon "public interest value" and which purported to determine market value based upon "environmental" highest and best use.... A mutually retained review appraiser found the Cargill New Chicago Marsh "public interest value" methodology to "have the effect of making the report misleading and biased," and on that basis such "public interest value" appraisal was stamped "UNAPPROVED" by the Office of Real Estate Design Services of the California Department of General Services.

First Amended Complaint ¶ 1. In sum, Hansen alleges that defendants' "public interest value" appraisal was fraudulent and that they knew it was fraudulent because an appraisal they had previously prepared for the New Chicago Marsh sale had been rejected by the State precisely because it appraised property based upon its "public interest value."

Defendants now move to dismiss on the ground that the allegations and/or transaction upon which Hansen's complaint are based were publicly disclosed prior to the filing of this lawsuit.

## DISCUSSION

### A. Jurisdiction Under The FCA [1]

■ " 'Congress enacted the False Claims Act to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." ' " *United States, ex rel. Aflatooni v. Kitsap Physicians Services,* 163 F.3d 516, 521 (9th Cir.1999) (citations omitted) (hereinafter *"Aflatooni"*). The FCA, however, expressly limits a court's jurisdiction over such claims:

> [n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing ... or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). The Act defines "an original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before fil-

---

1. Plaintiff also makes claims under the California False Claims Act, Government Code § 12650 *et seq.* The jurisdictional bar of the California statute is nearly identical to the federal FCA and the parties have cited only federal cases in their papers. Accordingly, the Court analysis of the issues in this Memorandum and Order applies equally to Hansen's federal an state claims except where otherwise noted.

ing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

This limitation on jurisdiction sets up a two-part test. First, a court must determine if there has been a "public disclosure" of the "allegations or transactions" upon which the FCA action is based. *See United States v. Alcan Electrical and Engineering, Inc.,* 197 F.3d 1014, 1018 (9th Cir.1999). Second, if the answer to the first question is yes, a court must determine whether the relator is "an original source." *Id.* The relator, as the plaintiff, bears the burden of establishing by a preponderance of the evidence that a court has subject matter jurisdiction, that is, that there has not been a public disclosure or, if there has, that the relator is an original source within the meaning of the FCA. *See id.* at 1017.

## B. The Public Disclosure Limitation

To constitute a "public disclosure" precluding jurisdiction the disclosure must (1) originate in a forum listed by the FCA, and (2) the content of the disclosure must identify either the allegations or the transaction alleged in the qui tam complaint. *See A–1 Ambulance Service, Inc. v. California,* 202 F.3d 1238, 1243 (9th Cir.2000). "Under Section 3730(e)(4)(A), public disclosure can occur in one of three categories of fora: (1) in a 'criminal, civil, or administrative hearing,' (2) in a 'congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation,' or (3) in the 'news media.'" *Id.* citing 31 U.S.C. § 3730(e)(4)(A). "If there has been public disclosure through one of these sources, [the Court] must then determine whether the content of the disclosure consisted of the 'allegations or transactions' giving rise to the relator's claim, as opposed to 'mere information.'" *Id.*

### 1. Whether Hansen's complaint is based upon publicly disclosed allegations

A FCA complaint is "based upon" publicly disclosed allegations if it is "substantially similar" to the publicly disclosed allegations. *United States ex rel. Lujan v. Hughes Aircraft Co.,* 162 F.3d 1027, 1032 (9th Cir.1998). In other words, the public disclosures must contain "enough information to enable the government to pursue an investigation against [the defendants]." *Alcan Electrical Engineering, Inc.,* 197 F.3d at 1019. The alleged "fraud need not be explicitly alleged to constitute public disclosure." *Id.* at 1020. Moreover, "allegations divorced from the information upon which they are based can constitute public disclosure." *Id.*

And, most importantly for purposes of this lawsuit, a qui tam complaint "filed after allegations have been publicly disclosed is, by definition, 'based upon' the publicly disclosed information, *even if the plaintiff made the disclosure.*" *Id.* (emphasis added). In *Alcan Electrical Engineering, Inc.,* for example, the court held that the qui tam complaint was based upon publicly disclosed information because the complaint's allegations were similar to allegations made by the relator in an unsealed complaint filed the previous week. *Id.* The fact that the publicly disclosed information was disclosed by the relator did not change the fact that the complaint was based upon publicly disclosed information.

Defendants contend that media stories, documents disclosed to Hansen and others in response to California Public Records Act requests, and documents disclosed to Hansen in response to his complaints of fraud to various California government agencies, all publicly disclosed the allegations and transactions upon which his qui tam complaint is based.

#### a. The Media Stories

Allegations which are reported in the news media are "publicly disclosed" for purposes of the FCA. *See* 31 U.S.C. § 3730(b)(4)(A); *Aflatooni,* 163 F.3d at 521.

◼

◼ On March 22, 1996, after the sale had closed but more than two years before this lawsuit was filed, KGO Channel 7 in San Francisco aired a television news story entitled "Getting Soaked" about Cargill's sales to the State, including its sale of the Napa Salt Marshes. The story repeated Hansen's allegations:

> Reporter: John Hansen charges that the State *knowingly* paid Cargill Salt much too much money for its wetlands. He claims there is a pattern of sweet heart deals between the State and the company. First, the new Chicago Marsh property. About 30 acres in the south bay. Hansen says Cargill's offer to sell in 1991 was way out of line.
>
> Hansen: They attempted to present an appraisal that was well beyond what any private party would willingly pay for it, and it was thrown out.
>
> Reporter: The State rejected Cargill's $740,000 offer; did its own appraisal and bought the land for less than half the amount. But on the next deal, even though Cargill's appraisal was so far off the first time, the State never even bothered to get its own appraisal. Hansen said that's even more shocking because the State received money for an appraisal from a trust fund set up after 1988 oil spill in Martinez.
>
> J. Schmidt: The State is required under law to have an appraisal made, and that appraisal must, in turn, be reviewed by the Department of General Services.
>
> Reporter: Still, the State just went along with Cargill's appraisal for the Napa marsh. The company got $10,000,000 cash and the $26,000,000 tax write off for charitable contribution.
>
> Hansen: The realistic economic value of this property, what you and I would pay for a business venture on this

property is someplace probably between 4 and 6,000,000.

(Emphasis added).

The KGO news story made allegations "substantially similar" to the allegations in the complaint. First, the story reported that Cargill submitted an appraisal for the New Chicago Marsh property that the State rejected. Second, it disclosed that Cargill subsequently submitted an appraisal for the Property. Third, it criticized the State for not conducting its own appraisal even though the previous Cargill appraisal had been rejected, and even though regulations required the State to commission its own appraisal. Fourth, it alleged that the Appraisal overvalued the Property and that as a result the State was paying too much. Fifth, it alleged that the State *knew* it was paying too much and was simply involved in a series of "sweet heart" deals with Cargill.

The fact that the story did not use the word "fraud" is immaterial. The reported allegations were tantamount to an explicit allegation of fraud and, in any event, "fraud need not be explicitly alleged to constitute public disclosure." *Alcan Electrical and Engineering, Inc.*, 197 F.3d at 1020. Moreover, although the story did not specifically allege that Cargill knew its Appraisal overvalued the Property, the unmistakable inference from the allegations is that Cargill and its appraisers knew the Property was overvalued. If the State knew it was overpaying, Cargill must have known the Property was overvalued, especially since the story accuses the State and Cargill of entering into a "sweetheart deal." In addition, the story reported that Cargill's Chicago Marsh appraisal had been rejected, a fact which Hansen claims is crucial to proving defendants' knowledge of the falsity of the Napa Salt Marshes Appraisal.

◼ Similarly, the fact that the KGO story did not mention the reason for the Appraisal's alleged overvaluation, that is, its use of conservation as the Property's highest and best use, is of no moment.

"[A]llegations divorced from the information upon which they are based can constitute public disclosure." *Alcan Electrical and Engineering, Inc.,* 197 F.3d at 1020. Moreover, a June 11, 1993 editorial in the San Francisco Business Times specifically reported that Cargill's Appraisal was "based on the parcel's use as a preserve, not for commercial purposes."

Other stories in the news media also questioned whether the Appraisal was accurate. *See* "Bay On Trial," *The Bay Institute of San Francisco* Summer 1993 (editorializing that "[w]hile this remarkably high appraisal does not increase the cash payment received by Cargill, it may hinder the acquisition of other wetland properties by inflating their value, and provide excessive tax benefits for the company at public expense"); "Skepticism greets wetland purchase," *Vallejo Times Herald,* Aug. 3, 1993 (reporting that one environmental group's "major concerns is that an inflated appraisal could drive up the value of surrounding property, which the group hopes to see purchases or otherwise preserved"); "Wetlands purchase doesn't please all," *Vallejo Times Herald,* Jan. 28, 1994 ("Bay Area environmental groups have criticized the Cargill purchase, arguing that the committee is paying too much for the property").

In sum, the KGO story, alone, and when considered in conjunction with the other news media stories discussing the sale, disclosed allegations substantially similar to the allegations made in Hansen's qui tam complaint.

**b. The OERA complaint**

There is no dispute that Hansen's OERA complaint disclosed the allegations upon which the lawsuit is based. The OERA's November 7, 1995 letter to Hansen states that the OREA "has concluded its investigation of your complaint ... alleging fraud, incompetence and incorrect methodology in the performance of an appraisal of the Cargill Napa Marsh property. The allegations specifically addressed the final estimate of value and highest and best use conclusion." The letter then identifies Hansen's specific allegations, including his allegation that the Appraisal's consideration of conservation as a highest and best use was unlawful.

The critical dispute is whether the letter originated in a forum identified by the FCA. The letter initially appears to fall within the first category of FCA fora: "congressional, *administrative,* or Government Accounting Office report, hearing, or investigation." 31 U.S.C. § 3730(b)(4)(A) (emphasis added). The letter was the result of a State agency investigation into Hansen's complaint. *See A–1 Ambulance Service, Inc.,* 202 F.3d at 1243 (stating that "it is axiomatic that agency actions are inherently 'administrative'"). In *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734 (3d Cir.1997), however, the court concluded that administrative ... "report, hearing, or investigation" does not refer to documents "produced by non-federal government sources." *Id.* at 745–46. The court reasoned that because Congress sandwiched the word "administrative" between "congressional" and "Government Accounting Office" Congress must have been referring to federal administrative documents, and that a more restrictive interpretation of "administrative" in the second category of FCA fora is consistent with the "purpose and tenor of the 1986 amendment" to the FCA. *Id.*

While the Ninth Circuit has not specifically held that the second category of FCA fora does not include non-federal sources, it has implied that it agrees with the *Dunleavy* court's reasoning. In *A–1 Ambulance Service, Inc.,* the court held that the term "administrative hearing" in the first category of FCA fora refers to federal or state administrative hearings. *A–1 Ambulance Services, Inc.,* 202 F.3d at 1244. In so holding, the court expressly distinguished *Dunleavy* on the ground that *Dunleavy* was interpreting the second category of public fora identified in the FCA, namely, "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." *Id.* Sig-

nificantly, the court concluded that *Dunleavy* "buttressed" its holding that "administrative" in the first category refers to federal and state proceedings because "[i]t is unlikely that Congress would have referenced administrative hearings twice in the same sentence, unless it intended to allude to different contexts." *Id.* at 1245. In other words, the fact that the FCA identifies "administrative hearing" in the first and second categories implies that "administrative" means something different in the second category than it does in the first. *Id.*

 Accordingly, the Court concludes that the phrase "administrative ... report, hearing, audit or investigation" in the second category of FCA fora does not include non-federal agency actions. To hold otherwise would lead to the anomalous result that disclosure of a state administrative report implicates the FCA jurisdictional bar while disclosure of a state legislative report—a report which is neither congressional, administrative or from the General Accounting Office—does not raise the jurisdictional bar. The Court declines to read the statute to compel such a nonsensical result.

Moreover, the Court's interpretation of the word "administrative" in the second category of FCA fora is consistent with the California FCA. The California statute provides that "no court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision, [3] or by the news media." Gov't Code § 12652(d)(3)(A). Only disclosures in an investigation by the "Senate, Assembly, auditor, or governing body of a political subdivision" bar jurisdiction. The statute does not bar jurisdiction for disclosures in an investigation by an administrative agency, such as the OERA.

The Court's conclusion, however, does not mean that Hansen may go forward with his complaint. As the Court concluded above, the various stories in the news media disclosed his allegations and therefore the jurisdictional bar still applies.

### 2. Public disclosure of the transaction

In addition to arguing that the news media stories and the OREA investigation disclosed Hansen's allegations, defendants argue that the transaction upon which the complaint is based was publicly disclosed. In particular, defendants contend that public disclosure of the Appraisal and the Trustee Committee's full record of consideration of the Napa Salt Marshes sale disclosed the transaction. The "jurisdictional bar is raised so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." *A–1 Ambulance Service, Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir.2000).

 Defendants' argument, however, suffers from the same defect as their argument as to the OERA letter. The Trustee Committee's record and the Appraisal were not publicly disclosed within the meaning of the FCA. The record was produced to the Santa Rosa Press Democrat in response to a California Public Records Act request and the Appraisal was disclosed to Hansen in response to a similar request. Defendants argue that the Trustee Committee records constitute an "administrative hearing" within the first category of FCA fora since "hearing" means "proceeding." *A–1 Ambulance Service*, 202 F.3d at 1244. While the Trustee Committee's consideration of the Napa Salt Marshes purchase may be considered a "proceeding" and therefore a "hearing" within the meaning of the FCA, however, much of the record produced in response to the Press Democrat's request included confidential documents which were not made available to the public until the specific request by the Press Democrat. The documents were therefore not produced in a Trustee Committee proceeding, but rather in response to a California

Public Records Act request. In *United States ex rel. Mistick PBT v. Housing Authority*, 186 F.3d 376, 383 (3rd Cir. 1999), *cert. denied,* (March 20, 2000), a case cited by defendants, the Third Circuit held that a response to a FOIA request is an "administrative report" or an "administrative investigation" falling within the second category of FCA fora. That category of FCA fora, however, does not apply to *state* administrative reports or investigations. *See A–1 Ambulance,* 202 F.3d at 1244; *Dunleavy,* 123 F.3d at 744–46. Thus, the public disclosure of documents pursuant to a California Public Records Act request is not a public disclosure within the meaning of the FCA. Nor is it a public disclosure under the California FCA since the documents were not produced in a "hearing," and were not produced in "an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision." Cal. Gov't Code § 12652(d)(3)(A).

### 3. Hansen's Other Arguments

Hansen contends that despite the public disclosure of his allegations in the news media, the public disclosure bar does not apply because certain details of the fraud were not disclosed. In particular, Hansen argues that it was never disclosed that (1) the transaction was accomplished as a back room deal without the normal process of review in that the State did not conduct its own appraisal and that working papers from an audit by the Bureau of State Audits show that the State, and in particular, the WCB, knew the property was overvalued but went ahead with the deal anyway, (2) an independent appraisal commissioned by Hansen determined that the Property is essentially worthless, and (3) it was not disclosed that it was unlawful for the appraisers to use "public interest value."

Hansen's argument fails because these alleged additional facts add nothing material to what was already disclosed. First, the allegations as to the WCB's knowledge of the alleged inaccuracy of the Appraisal are irrelevant to *defendants'* fraud. The State officials are not defendants in this action. Hansen's qui tam lawsuit alleges that defendants—Cargill and its appraisers—made a false statement to the California and federal governments. That certain California officials may have believed the Property was overvalued is immaterial.

Second, Hansen's appraisal merely served as support for his allegations. Since allegations divorced from the information upon which they are based may constitute a "public disclosure" for purposes of the jurisdictional bar, *see Alcan Engineering, Inc.,* 197 F.3d at 1020, the failure to disclose the results of Hansen's appraisal (because it had not yet been obtained) does not provide the Court with jurisdiction of this action. To put it another way, Hansen's appraisal was not an essential element of his allegation of fraud, especially since there is no allegation that defendants represented that the value of the Property was $34 million under any theory of valuation other than public interest value.

Third, the fact that the news stories did not explicitly allege that the public interest value method was allegedly a violation of various regulations is also irrelevant. The regulations were publicly disclosed. All Hansen has done is allege that Cargill's publicly disclosed method of valuing the Property violated publicly disclosed regulations. *See A–1 Ambulance,* 202 F.3d at 1245.

Moreover, the details of the State's alleged complicity in the fraud were in fact publicly disclosed. The 1996 KGO story reported that the State was not conducting its own appraisal even though it had been budgeted monies just for that purpose. The story even reported that it was puzzling that the State was not conducting its own appraisal given that Cargill's appraisal for the New Chicago Marsh property had overvalued that property. The story also reported that the State *knew* it was overpaying for the Property.

**1182**

The cases cited by Hansen do not compel a different outcome. In *Dunleavy,* for example, the court held there had not been a public disclosure because an essential element of the fraud—the County's misrepresentation of certain facts—had not been disclosed. *Dunleavy,* 123 F.3d at 743–44. In particular, the court held that the public disclosure bar did not apply because the publicly disclosed information did not raise an inference of fraud. *Id.* at 743. Similarly, in *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1513 (8th Cir.1994), the court held that stories in the news media were not public disclosures of the transactions at issue because the stories did not raise an inference of defendants' fraud. *Id.* at 1512–14. Here, in contrast, the KGO story included an express allegation of fraud, or, at a minimum, raised an inference of fraud by the defendants.

Finally, Hansen implies that because he was the source for the KGO story, the publication of his allegations in that story cannot bar his lawsuit. This theory has been squarely rejected by the Ninth Circuit. *See Aflatooni,* 163 F.3d at 521–22; *United States ex rel. Biddle v. Board of Trustees of the Leland Stanford, Jr. University,* 147 F.3d 821, 828 (9th Cir.1998).

## C. The Original Source Exception

Having determined that the 1996 KGO story alone, and together with the other stories in the news media, publicly disclosed the allegations upon which this lawsuit is based, the Court must now determine whether it nonetheless has jurisdiction because Hansen was the "original source" of these disclosures.

■ To qualify as an "original source," a relator must have (1) "direct and independent knowledge of the information on which the allegations are based," (2) "voluntarily provided the information to the Government before filing an action," (3) and "had a hand in the public disclosure of allegations that are a part of [his or her] suit." *United States ex rel. Devlin v. California,* 84 F.3d 358, 360 n. 3 (9th Cir.1996)

(citations omitted); *Alcan Electrical Engineering, Inc.,* 197 F.3d at 1020.

The latter two requirements are essentially undisputed. Hansen voluntarily provided the government with his information before he filed this action. Hansen also "had a hand in the public disclosure of allegations that are a part of [his] suit." For example, Hansen was quoted in and was the source for the relevant portions of the 1996 KGO story.

■ The "direct and independent" requirement must be read in the conjunctive; in order to qualify as an original source Hansen must have direct *and* independent knowledge of the information upon which his allegations are based. *See Alcan Electrical and Engineering, Inc.,* 197 F.3d at 1020; *Aflatooni,* 163 F.3d at 525; *United States ex. rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 656 (D.C.Cir.1994). A relator's information is independently obtained when it is acquired prior to the public disclosure of the allegations. Since Hansen was responsible for the public disclosure of the allegations in the KGO story, it appears his knowledge is "independent." *See Alcan Electrical and Engineering, Inc.,* 197 F.3d at 1020 (holding that relator's information was independent because it was acquired before he filed the complaint which constituted the public disclosure). "Therefore, the key issue is whether [Hansen] has 'direct' knowledge of the alleged fraud." *Id.* The Ninth Circuit has framed the inquiry as follows: "the relator 'must show that he had firsthand knowledge of the alleged fraud, and that he obtained this knowledge through his own labor unmediated by anything else.'" *Id.* (quoting *Aflatooni,* 163 F.3d at 525). "A person who learns secondhand of the allegations of fraud does not have 'direct' knowledge within the meaning of [the FCA]." *Devlin,* 84 F.3d at 362.

In *Alcan Electrical Engineering, Inc.,* for example, a member of a union alleged that the union was unlawfully deducting money from union members' paychecks

and then paying these funds back to the federal contractors that were employing the members. The "false statements" involved the contractors representing to the United States that they were paying prevailing wages to their employees. 107 F.3d at 1016–17. The relator had alleged that he became aware of the fraud "through his status as a union member" and that he knew about it well before he obtained the documents which confirmed the fraud. *Id.* at 1021. The court held that the relator did not have "firsthand" knowledge and thus was not an original source. The relator himself had not had the illegal sums withheld from his paychecks; he never participated in the negotiating, drafting, or the implementation of the "fraudulent agreement;" and he had not played any role in submitting false claims to the government. *Id.* The allegation that he had learned of the information due to his status as a member of the union was insufficient to support a finding that he learned of the information "first hand." *Id.; compare with Wang v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir.1992) (holding that an engineer-relator who had been retained to study a problem had "direct" knowledge of the fraud because "he saw [it] with his own eyes" and his knowledge was "unmediated by anything but his own labor").

Here, Hansen obtained his knowledge of the alleged fraud second hand; he was not a percipient witness to any of the alleged facts upon which his allegations are based. First, he alleges that the use of "public interest value" to appraise the Property was fraudulent. He did not have any firsthand knowledge, however, of the how the Appraisal was prepared. Indeed, he did not even see a copy of the Appraisal until he made a California Public Records Act request in 1996. He attests merely that he made an inquiry into the Napa Salt Marshes transaction "and became aware that the appraisal methods being used for the subject salt ponds were routinely being used to effect inflated land values in government land transactions." This statement is insufficiently specific to support a

finding that Hansen had direct knowledge of the valuation method used in the Appraisal, just as the relator's statement that he learned of the fraud because of his status as a union member was insufficiently specific to support a finding of firsthand knowledge. *Alcan Electrical Engineering, Inc.,* 197 F.3d at 1021.

Second, Hansen alleges that defendants knew the Appraisal was false because the State had previously rejected the New Chicago Marsh appraisal on the ground that the public interest value method is misleading. Hansen admits, however, that he learned of the New Chicago Marsh appraisal—a transaction which he contends is critical to his allegation of fraud—not from any firsthand knowledge but rather from information and documents an official in the California Office of Real Estate and Design Services provided to him. *See United States ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d 699, 703 (8th Cir.1995) ("a person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA]"), cited with approval in *Devlin,* 84 F.3d at 362.

Third, Hansen alleges that State officials knew the Appraisal overvalued the Property. Again, he does not have firsthand knowledge of this allegation. Rather, he admits that he relies upon on a statement in the working papers of the Bureau of State Audits to support his allegation.

Part of the difficulty in analyzing the "direct" requirement in the context of this case is that Hansen appears to argue that he has "direct" knowledge of the information upon which his allegations are based because he alone has publicly characterized the defendants' use of the public interest value method as fraudulent. His characterization of information of which he does not have direct knowledge, however, merely adds a legal name to that secondhand knowledge. *See Alcan Electrical Engineering, Inc.,* 197 F.3d at 1020 (hold-

ing that relator did not have "direct" knowledge because "his investigation merely added a legal name to describe the alleged circle of facts"). In other words, the "characterization" of the Appraisal as fraudulent is not independent "information" of which Hansen can have direct knowledge. *See A–1 Ambulance Service, Inc.*, 202 F.3d at 1245. To put it another way, the Hansen's allegation that the defendants' use of public interest value is "fraudulent" is not *evidence* of fraud. *See Aflatooni*, 163 F.3d at 526 (holding that the information relator acquired was not evidence of fraud and therefore he did not have direct knowledge of fraud).

The only "direct" or "firsthand" knowledge Hansen arguably possesses is his knowledge of the appraisal he commissioned in 1998. His commission of the 1998 appraisal, however, does not make him an "original source." In *Devlin,* for example, an employee of the county social services department ("SSD") told the relators that he and others in the SSD were submitting false claims to the federal government. The relators then conducted their own investigation by contacting SSD clients who told the relators that they did not receive the services for which the SSD had allegedly billed the government. The Ninth Circuit concluded that the relators' personal efforts to verify the information by contacting SSD clients did not make them an original source because the verification did not add anything of significance to the information already obtained. The court noted that "it is virtually certain that federal investigators would have done precisely the same thing once the information provided by [the SSD employee] had been made public." *Devlin,* 84 F.3d at 362. Hansen's appraisal similarly does not add anything of significance to his earlier allegations. Any federal investigator (who actually thought there was fraud rather than a legitimate disagreement over the proper method of valuation) could have commissioned an independent appraisal of the Property, just as investigators could have interviewed the alleged clients in *Devlin.* Moreover, Hansen's appraisal is not, in

any event, evidence of fraud. It is evidence only that the Property may have a different appraised value when one evaluates it under a method other than public interest value.

Hansen's contention that he is an "original source" because he was working with government officials as an unpaid consultant and thus a "close observer" of the sale misses the point. The issue is not whether he closely watched the transaction unfold, but rather whether he has firsthand knowledge of the facts upon which his allegations are based.

The evidence he has submitted does not support a finding that he has direct knowledge. For example, he submits declarations from three former members of the Trustee Committee. None of these declarations creates a genuine dispute as to whether he has direct knowledge. Indeed, none of these declarations even supports a finding that Hansen worked as a consultant for the Trustee Committee. One of the declarants, Felix Smith, was not even on the Committee at the time it was considering and negotiating the sale. Another, Ruth Pratt, states only that Hansen "has become the most knowledgeable person I know regarding the appraisal and acquisition process for the Cargill Napa salt pond property." Such a statement is wholly insufficient to support a finding of *direct* knowledge. A third, Elizabeth Radke, attests that Hansen provided her with information useful to her analysis of the Cargill transaction, but she does not identify what information he provided her, other than the Appraisal itself—a document of which Hansen does not have any firsthand knowledge. None of the other declarations submitted by Hansen supports a finding that he has direct knowledge of the information upon which his allegations are based. Accordingly, Hansen is not an "original source" within the meaning of the FCA.

 The Court's holding is consistent with the purpose of the FCA. One "purpose of the FCA is to encourage individuals with true 'knowledge' of alleged wrong-

doing to come forward and provide such information to the Government." *Aflatooni,* 163 F.3d at 526. That purpose is not "served by allowing a relator to maintain a quit tam suit based on pure speculation or conjecture." *Id.* Yet, to allow Hansen's lawsuit to go forward would do just that. He has no real evidence of any fraud; only his speculation (rejected by two independent state agencies) that defendants' use of the public interest value was fraudulent and that they had actual knowledge that it was fraudulent.

■ Moreover, as Hansen himself asserts, another purpose of the FCA is "to encourage *insiders* to come forward with such information where they would otherwise have little incentive to do so." *Biddle,* 161 F.3d at 538 (emphasis added); *see also id.* at 539 (quoting legislative history that states that the purpose of the FCA is to " 'reward those private individuals who take significant personal risks to bring such wrongdoing to light' ") (quoting S.Rep. No. 99–345, at 14 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5279). Hansen is not an insider with little incentive to come forward. He is the Executive Director of a non-profit watchdog organization whose express purpose is to uncover such alleged fraud. To hold that Hansen is an original source would mean that anyone—an insider or an outsider—who conducts an investigation and learns of alleged fraud from whatever sources may maintain a qui tam action. For example, an investigative reporter who uncovers fraud in connection with a story he is covering could be considered an original source even if he does not have any firsthand knowledge of the alleged fraud. Such a holding would render the statutory requirement that an original source have "direct" "firsthand" knowledge meaningless. While Hansen should be commended for his service to the public, he does not have direct knowledge of the alleged fraud at issue here and thus is not an "original source."

**D. Other Issues**

In the alternative, Hansen argues that if there are any disputes of fact an evidentiary hearing must be held. The Court's conclusion that it does not have jurisdiction, however, is based upon the undisputed facts. First, the undisputed fact of what is alleged in Hansen's First Amended Complaint. Second, the undisputed fact of the publication and content of the stories in the news media. Third, the facts as to Hansen's direct knowledge of the alleged fraud as supported by Hansen's evidence. Since the Court concludes that Hansen's evidence, without considering any evidence submitted by defendants, does not support a finding of direct knowledge, the Court need not hold an evidentiary hearing to determine if Hansen is an original source.

## CONCLUSION

For the foregoing reasons the Court finds that the allegations upon which Hansen's complaint are based were publicly disclosed in the news media and that Hansen is not an original source because he does not have "direct" knowledge of the information upon which his allegations are based. Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED. Each party shall bear its or his own costs.

**IT IS SO ORDERED.**