The Honorable Paul Weaver State Representative P.O. Box 33 Violet Hill, AR 72584-0033
Dear Representative Weaver:
I am writing in response to your request for my opinion regarding the legality of a contract for the provision of emergency medical services ("EMS") in Izard County. You have reported the facts as follows:
 Izard County established by vote of the people an EMS service in Izard County. The vote on this issue took place around 1980. Since that time, the EMS Board has contracted the service to some provider for a bid price.
 The ordinance, as voted on by the people, directed that each household would pay $15.00 per year affixed to their tax statement. This fee would guarantee emergency medical service to each household. The ordinance also stated that providers could file on any individual insurance or available Medicare. The ordinance prohibited the provider from billing any paid covered household for additional money.
 The new provider has advised the EMS Board that not being able to bill the covered household would violate a Federal Law. The ordinance does allow the provider to bill households that do not pay their $15.00 fee. . . . [N]o prior provider has had a problem. The people understand they have EMS coverage for their $15.00 and should not be sent bills their insurance or Medicare would not pay.
Given this background, you have asked me to address the following question:
 Do the billing provisions of the EMS contract as authorized by the Izard County ordinance violate any federal law?
RESPONSE
I am neither equipped nor authorized to answer your question, since doing so will entail a factual inquiry into the precise terms of the ordinance and the service contract at issue. You have further failed to specify what federal law the new provider claims the described billing procedure would violate. However, I have located one California precedent that challenged a similar program under the False Claims Act,31 U.S.C. §§ 3729-3733 (the "FCA"). In my opinion, assuming the program was impartially administered, it should withstand any such challenge.
I gather from your description of the Izard County EMS program that it was organized pursuant to Act 51 of 1979, currently codified at A.C.A. §20-13-301 et seq., which authorizes any county, subject to certain procedural requirements, to establish by ordinance an EMS system funded in whole or in part by a levy of service charges. Although it is unclear in your request, I assume Izard County has contracted with an EMS provider to serve the area for a base "bid price" in the nature of a subsidy. In the case of those residents who use the service and have elected to pay the $15.00 annual levy, the EMS provider may apparently seek recovery of its fees from any available insurance or Medicare. By contrast, in the case of users who have elected not to pay the levy, the EMS provider may additionally seek recovery personally from the patient. At issue in your request is whether some federal law might bar this arrangement.
I have found only one instance in any jurisdiction in which a plaintiff has contended that an arrangement of the sort you have described violates federal law. In A-1 Ambulance Service, Inc. v. California et al.,202 F.3d 1238 (9th Cir. 2000), an unsuccessful bidder to provide ambulance service to various counties sued two counties and two successful bidders in those counties for alleged violations of the FCA.[1] The Ninth Circuit Court of Appeals summarized the plaintiff's theory of liability as follows:
 A-1 alleges that the Counties' ambulance service contracts perpetrate a fraud upon the federal government in violation of the False Claims Act. In a nutshell, A-1 contends that the costs of providing ambulance services to county-responsible indigents are unlawfully shifted from the Counties to private and third-party payors, including the federal Medicare program. Such unlawful cost-shifting occurs, A-1 argues, because the Counties' ambulance service contracts offer little or no subsidy to cover the costs of ambulance services for their indigent populations. According to A-1, therefore, Med-Trans and Pen-Med are forced to charge artificially inflated rates to Medicare-covered patients in order to offset the losses incurred when rendering ambulance services to indigent patients. As a result, A-1 claims that the Counties' ambulance service contracts effectively compel the federal government, in violation of the Medicare Act, to subsidize ambulance services at "exorbitant" rates for indigent patients who are otherwise ineligible for Medicare benefits.
202 F.3d at 1242. The court further characterized this claim as follows:
 In its qui tam action, A-1 essentially alleges that the Counties, together with Med-Trans and Pen-Med, conspired to shift some of the costs of emergency ambulance services from the Counties to Medicare in violation of the anti-kick-back provisions of the Medicare Act, 42 U.S.C. § 1320a-7b(b).
Id. at 1241.
The plaintiff's argument, then, was basically that Medicare-eligible claimants were being overcharged in order to subsidize emergency services to indigent patients. Although the Ninth Circuit Court somewhat dismissively characterized this argument as a "novel legal theory of fraud," id. at 1245, it affirmed the district court's dismissal of the plaintiff's claim on another ground — namely, that the plaintiff lacked standing to sue because the terms of the service agreements had been publicly disclosed in open hearings, thus triggering the jurisdictional bar against qui tam suits set forth at 31 U.S.C. § 3720(e)(4)(A).[2]202 F.3d at 1243, 1245.
In the present case, assuming the successful "bid price" referenced in your request is inadequate to defray the costs of providing emergency services, and further assuming Medicare-eligible recipients of emergency services are charged rates in excess of the actual cost of their emergency care, thereby arguably subsidizing such services to the indigent, a plaintiff might conceivably allege a violation of the FCA on the theory advanced in A-1 Ambulance. However, I strongly doubt any such challenge would be successful. I see no principled distinction between inflation in the cost of emergency services, which was at issue in A-1Ambulance, and inflation in the cost of medical care generally, which I am unaware has ever been challenged as perpetrating a fraud on Medicare. So far as I can determine, the government itself has never prosecuted an action under the FCA alleging a fraud of the sort alleged in A-1Ambulance. Moreover, in my opinion any qui tam action alleging such a fraud would in all likelihood be dismissed on jurisdictional grounds if the statutory requirements of public notice and hearings were met. See
A.C.A. § 20-13-301 et seq.
In summary, as a general proposition, I do not believe federal law prohibits a county from negotiating a contract with a provider of emergency services under which the provider agrees to forbear directly billing patients who have elected to pay an annual fee for such services. However, as previously noted, I cannot opine on the particular contract that gave rise to your request. I suggest the county consult local counsel for guidance.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
[1] The United State Supreme Court has recently described the FCA as follows:
 Originally enacted in 1863, the False Claims Act (FCA) is the most frequently used of a handful of extant laws creating a form of civil action known as qui tam. As amended, the FCA imposes civil liability upon "[a]ny person" who, inter alia, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). The defendant is liable for up to treble damages and a civil penalty of up to $10,000 per claim. Ibid. An FCA action may be commenced in one of two ways. First, the Government itself may bring a civil action against the alleged false claimant. § 3730(a). Second, as is relevant here, a private person (the "relator") may bring a qui tam
civil action "for the person and for the United States Government" against the alleged false claimant, "in the name of the Government." § 3730(b)(1).
Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,529 U.S. 1858, 1860, 120 S.Ct. 1858 (2000). In a footnote to this passage, the Court defined the term qui tam as follows:
 Qui tam is short for the Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which means "who pursues this action on our Lord the King's behalf as well as his own." The phrase dates from at least the time of Blackstone. See 3 W. Blackstone, Commentaries
*160.
Id. at 1860 n. 1.
[2] The reasoning behind this jurisdictional bar would appear to be that the government is at least constructively aware of any alleged fraud perpetrated against it if the fraud has been publicized, thus rendering it unnecessary for any private individual or entity to vindicate its interests. See Bly-Magee v. California, 2001 WL 2078, *3 (9th Cir. 2001) ("`[q]ui tam suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime,'" quoting Wang v. FMCCorp., 975 F.2d 1412, 1419 (9th Cir. 1992)).